IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. 74,305






DENARD MANNS, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL

FROM BELL COUNTY





 Keller, P.J., delivered the opinion of the Court in which MEYERS, PRICE,
HOLCOMB and COCHRAN, JJ., joined. WOMACK, JOHNSON, KEASLER, and HERVEY,
JJ., concurred in the result.


O P I N I O N




 Appellant was convicted in February 2002 of capital murder. (1) Pursuant to the jury's answers to
the punishment special issues, the trial judge sentenced appellant to death. (2) Direct appeal to this Court is
automatic. (3) Appellant raises six points of error. We shall affirm.

I. FACTUAL SUFFICIENCY - GUILT


 In point of error six, appellant contends that the evidence was factually insufficient to support his
conviction. Specifically, he contends that the evidence was insufficient to identify him as the perpetrator. 
He asserts that the evidence consisted of a stain on an item of the victim's clothes, along with an "undated"
fingerprint on the barrel of a weapon to which more than one person had access. He also asserts that there
was an "original suspect" whose access to the weapon was as much as, or more than, appellant's, and he
claims that the jury heard the case in a vacuum - being led by the State to believe appellant was the only
possible guilty party. Earlier references in appellant's brief and evidence in the record suggest that
appellant's reference to an "original suspect" is to his half-brother, Murray Bamberg.

A. The law


 Under the factual sufficiency standard, an appellate court conducts a neutral review of all the
evidence, both for and against the jury's verdict, and determines whether "the proof of guilt is so obviously
weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if
taken alone, is greatly outweighed by contrary proof." (4) The appellate court should reverse only if it
determines that a manifest injustice has occurred. (5) 

B. The evidence against appellant 


 The evidence against appellant was much weightier than his brief suggests. There were at least six
significant items of evidence tying appellant to the murder: (1) his proximity to the victim, (2) his access to,
and fingerprint on, the murder weapon, (3) his DNA on the victim's brassiere, (4) his possession of the
victim's jacket, (5) his possession of the victim's ring, and (6) his admission of guilt to a third party.

1. Proximity


 Michelle Robson, the victim, was found dead in a bathtub on November 19, 1998. There was no
sign of forced entry - indicating that the murderer was likely someone the victim knew. At one time,
appellant lived with his half-brother Bamberg and his cousin Eric Williams. Bamberg and Williams lived
two doors down from the victim.

2. The murder weapon


 The victim suffered five gunshot wounds from a .22 caliber gun. Eric Williams owned a .22. 
Bamberg and appellant both knew where the gun was kept. Williams often kept the back door to his home
unlocked because Bamberg had no key. About 8:30 or 9:00 in the evening on November 18th, Williams
found a bullet on the floor in front of his dresser. He called Bamberg, who had no explanation for the
bullet's presence. Shortly thereafter, appellant arrived and told Williams that he had been at the residence
earlier that day. When Williams learned that the victim had been killed with a .22, he turned his gun over
to the police. A firearms expert determined that at least one of the bullets recovered from the victim's body
was fired from Williams's gun. The other bullets could not be excluded as having come from the gun. 
Fingerprint testing of the gun revealed fingerprints from Williams and one fingerprint from appellant. No
fingerprints from Bamberg were found on the gun.

3. Appellant's DNA


 The victim was found wearing a black brassiere, which had semen stains on it. DNA testing
showed that DNA from the semen stains matched appellant's DNA. The probability of another person
matching the DNA profile was one in 869,600,000,000 for black persons, and even lower for persons of
Caucasian or Hispanic descent.

4. The victim's jacket


 On November 19th, appellant went to the residence of friend, Barbara Feazell. He left at the home
a jacket, which Feazell later turned over to law enforcement investigators. In one of the pockets was a
cigarette butt containing appellant's DNA. Kellie Lynn Meyer, a friend of the victim, identified the jacket
as belonging to the victim.

5. The victim's ring


 While appellant was at Feazell's, several rings fell out of his pants pocket. One of these rings was
turned over to the police. A Von Maur department store receipt showed that the victim purchased a ring
with markings consistent with the ring that had been turned over.

6. Confession to a third party


 Richard Ray Broome was in the county jail awaiting parole revocation proceedings. He was
known by other inmates as a "jail house lawyer," who helped other inmates with legal research and other
legal matters. Appellant asked Broome for his opinion about the proceedings connected with this case. 
Appellant told Broome that the government had a gun with his fingerprint on it. Appellant later clarified that
the gun was a .22. He further said the government had the gun that killed a woman but could not prove
it because a .22 caliber bullet shatters when it hits the bone. The fact that the murder weapon was a .22
was not published in the media. Later, appellant showed Broome a letter from Bamberg and said, "This
is the man that handed me to them on a silver platter after I shot the woman."

C. The evidence in appellant's favor


 In his brief, appellant points to no favorable evidence, other than to suggest that Bamberg was the
perpetrator. There was some evidence that Bamberg was the original suspect. One could infer that, as
appellant's half-brother, Bamberg might have similar DNA. He also had access to the murder weapon and
lived near the victim. There was also evidence that Bamberg was a criminal. The letter shown to Broome
was apparently written while Bamberg was an inmate in the prison, and Williams referred to Bamberg as
a thief.

 There is some other evidence, not mentioned in appellant's discussion of this point of error, that
might be construed as favorable. Appellant testified at trial that he did not commit the murder. He testified
that he obtained the victim's jacket from an acquaintance who committed burglaries in the neighborhood. 
He testified that he obtained a film canister full of gold jewelry from a drug addict. Though appellant told
police that there would be no reason for his fingerprints to be on Williams's gun, he testified that he had
taken it away from some of Bamberg's friends who were trying to shoot it. Appellant further testified that
he had never been inside the victim's apartment and had never had sex with her.

D. Analysis


 Given the above, we cannot find that the evidence supporting conviction was so obviously weak
as to render the jury's verdict manifestly unjust. Nor do we find the supporting evidence to be greatly
outweighed by contrary proof. The only contrary proof appellant points to is his suggestion that Bamberg
committed the crime. But, the evidence linking Bamberg to the crime is rather weak. Although Bamberg
also had access to the murder weapon, his fingerprints were not on it. And while Bamberg's DNA might
be similar to appellant's (although there was no evidence of that), he is only a half-brother and so half of
his DNA would be from a different source. Moreover, Bamberg was not linked to the victim's jacket or
ring, and he did not confess to a third party. The evidence was factually sufficient. Point of error six is
overruled.

II. BROOME'S TESTIMONY


 In point of error one, appellant complains that Broome's testimony violated his Sixth Amendment
right to counsel because Broome was a state agent who deliberately elicited appellant's incriminating
statements. Because we find that Broome was not an agent of the State when he conversed with appellant
about appellant's pending prosecution, we hold that there was no violation of the Sixth Amendment. 

A. Factual background


 In the 1980's, Broome was on parole for the offense of unauthorized use of a motor vehicle and
was arrested for violating that parole. While he was in jail pending revocation proceedings, he obtained
information about a murder. In 1992, he testified against the murder defendant, who was sentenced to
ninety-nine years in prison. Although Broome had hoped the information he obtained would help him in
front of the parole board, his parole was revoked anyway.

 Broome was later convicted of possession of methamphetamine and sentenced to twelve years in
prison. He was subsequently paroled. On September 2, 1999, Broome was arrested for driving while
intoxicated (misdemeanor) and also because of a parole-violation warrant. Broome began negotiating with
the District Attorney's office and the Temple Police Department regarding information he claimed to
possess regarding drug cases. Billy Curry, an investigator for the District Attorney, helped arrange a
meeting between Broome, himself, an assistant district attorney, and members of the Temple Police
Organized Crime Unit. Although Broome supplied some information, he was not promised anything. (6) Nor
was he asked to obtain any additional information. The county attorney expressed a willingness to dismiss
the DWI case if the parole board would agree not to revoke Broome's parole, but the parole board would
not agree.

 During February and March of 2000, Broome shared a cell with appellant. In February, Scott
Stevens, Broome's attorney, advised the District Attorney's office that Broome had information about
appellant's case that might be helpful. Broome was brought to the District Attorney's office on February
24th, and Curry was given the task of taking Broome's statement. Both Curry and Broome testified at trial
that Curry made no promises or offers and that he did not ask Broome to elicit any more information. 
Curry told Broome that, if he had further need to contact the District Attorney's office, he should do so
through his attorney. Curry testified that this admonition was routinely given to inmates who had pending
cases.

 A subsequent communication between Broome and his attorney's office led Broome to believe that
the meeting with Curry had not been authorized by Stevens. As a result of this misunderstanding, Broome
wrote a letter to Curry complaining that Curry had misled him about whether the February 24th interview
had been authorized by his attorney. In the letter Broome further stated, "Also, the information you
requested me to obtain I have." At trial, Broome explained that this statement was a lie and that he made
it because he was mad and he had read a case in the law library that held "if you were asked to do this then
they couldn't use you to testify." Broome had written the number of the case on the front of the envelope
containing the letter. Broome also stated in the letter that he had a lot of things on his mind and found things
hard to recall after more than a week or two. At trial, Broome denied that this latter statement was some
sort of negotiating tactic. 

 When the misunderstanding was later cleared up, Broome's attorney contacted the District
Attorney's office to arrange a second meeting. Stevens recalled from his prior conversations with Broome
that Broome "had given information, that he got the impression that the information may or may not be
enough, but that he was not asked for more information; and then after that time he contacted me about
having more information and asked me to recontact the D.A.'s office." Pursuant to this request for a
second meeting, Curry interviewed Broome on March 3rd. Curry testified that no offers, inducements, or
promises were made to Broome at this meeting. Curry also testified that he did not imply at this meeting
that anything would happen as a result of Broome's statement.

 Broome denied that avoiding parole revocation was a motive for offering information about
appellant. He testified that the parole issue was "dead in the water" because the parole board had already
indicated that his parole would be revoked. He also denied that the information would speed up his release
because the parole board had designated him to "serve all" and his new release date was for mandatory
supervision.

 Stevens testified that the District Attorney's office made no promises, but it was Stevens's
understanding that "if the District Attorney's Office felt like that there was assistance that merited or there
was information that merited some consideration, that they might give that consideration at some point in
the future if he gave the information." Stevens's testimony did not make clear how and when he came to
this understanding. At some point after both interviews with Broome, the District Attorney's office decided
that Broome's information was worth dismissing the DWI, if the County Attorney would agree. The
County Attorney agreed, and the DWI was dismissed on March 20th. That same day, Broome's parole
was revoked.

 Finally, the record does not delineate which portions of Broome's testimony relate to information
given in the first interview and which portions relate to the second interview. Broome's testimony regarding
the defendant's statements has already been detailed in the factual sufficiency portion of this opinion.

B. Analysis


1. Standard of review


 In approaching a Sixth Amendment right-to-counsel question, as with many other constitutional
issues, we employ the now familiar bifurcated standard of review articulated in Guzman v. State. (7) An
appellate court should afford "almost total deference" to a trial court's determination of the historical facts
and to its determination of mixed questions of law and fact that turn on an evaluation of credibility and
demeanor. (8) Mixed questions of law and fact that do not turn on credibility and demeanor are to be
reviewed de novo. (9)

2. Supreme Court cases


 The Supreme Court's cases in this area of the law assume that status as a government agent is a
component of the constitutional violation but do not expressly address how we should determine that
someone occupies that status. In Massiah v. United States, a co-defendant agreed to cooperate with the
government and consented to the installation of a surreptitious listening device in his automobile. (10) This
cooperation occurred without the defendant's knowledge, and the co-defendant later engaged the
defendant in a lengthy conversation that was secretly recorded. (11) The Supreme Court held that this
procedure violated the defendant's Sixth Amendment right to counsel because "federal agents had
deliberately elicited" the incriminating statements after the defendant had been indicted and in the absence
of counsel. (12) Massiah did not discuss why the co-defendant was considered a government agent -
perhaps because his status was obvious or because federal law enforcement officers were involved in the
surveillance.

 In United States v. Henry, an inmate engaged by the Federal Bureau of Investigation as a paid
informant elicited incriminating information from the defendant after the defendant's right to counsel had
attached. (13) The inmate had been a paid informant for over a year and was paid only if he produced useful
information. (14) The inmate was in the Norfolk City Jail and informed an FBI agent that several federal
prisoners, including Henry, were in his cellblock. (15) The agent told the inmate to be alert to any statements
made by the federal prisoners but not to initiate any conversation with, or question Henry about, the bank
robbery. (16) Despite the FBI agent's admonition, the inmate took affirmative steps to secure incriminating
information. (17) The inmate was subsequently paid for furnishing the information. (18) 

 The Supreme Court posed the question as: "whether under the facts of this case a Government
agent 'deliberately elicited' incriminating statements from Henry within the meaning of Massiah." (19) The
Court found three factors to be important: (1) the inmate "was acting under instructions as a paid informant
for the Government," (2) the inmate "was ostensibly no more than a fellow inmate of Henry," and (3)
"Henry was in custody and under indictment at the time he was engaged in conversation" by the inmate. (20) 
In finding that the Sixth Amendment was violated, the Supreme Court held that Massiah did not turn upon
whether government officials were monitoring the conversation or upon whether the co-defendant
"questioned Massiah about the crime or merely engaged in general conversation about it." (21) In a couple
of footnotes, the Court suggested that the testimony of a different inmate, who was not a paid informant and
had no arrangement to monitor or report conversations with the defendant, was validly admitted. (22) Thus,
while the Henry opinion's focus appeared to be upon whether the statements were "deliberately elicited,"
the Supreme Court recognized that government agency was a component of the constitutional violation and
seemed to indicate that, in the case before it, the existence of a constitutional violation turned, at least in
part, upon the inmate-informant's status as a government agent. While not addressing directly what makes
an informant a government agent, the Court's opinion at least indicates that an informant qualifies if he has
a prior arrangement with the government to be paid for obtaining information and is directed in some
manner to obtain information from the defendant.

 Maine v. Moulton involved facts similar to those found in Massiah: a co-defendant who had
agreed to cooperate with the government was outfitted with a surreptitious listening/recording device and
engaged with the defendant in conversations that were recorded. (23) In exchange for his cooperation, the
government agreed to bring no further charges against the co-defendant. (24) In its discussion, the Supreme
Court characterized the co-defendant as an "agent of the State" and held that concealing the co-defendant's
status resulted in a denial of the defendant's right to counsel. (25) Moulton essentially applied Henry's
clarifications to Massiah-type facts but otherwise adds little to the present discussion. (26) Both Massiah and
Moulton indicate that an informant need not be paid monetarily for his cooperation to be deemed a
government agent. If some sort of quid pro quo is required, a deal regarding criminal charges will suffice.

 The final Supreme Court case relevant to this discussion is Kuhlmann v. Wilson. (27) In that case,
an inmate entered into an arrangement with a police detective to become an informant and report
statements made by the defendant. (28) The Court's opinion does not reveal the nature of this arrangement. 
The inmate was placed in the cell with the defendant for the purpose of learning the identity of the
defendant's accomplices. (29) The inmate was instructed not to ask questions but to "keep his ears open" for
the names of other perpetrators. (30) The inmate-informant followed these instructions, and in the course of
time, the defendant made incriminating admissions. (31) The Supreme Court implicitly assumed that the inmate
was a government agent but found no constitutional violation because the inmate did nothing to elicit the
defendant's incriminating statements. (32) The Supreme Court found that no Sixth Amendment violation
occurred because government agents did not take any action that would have constituted "the functional
equivalent of interrogation":

As our recent examination of this Sixth Amendment issue in Moulton makes clear, the
primary concern of the Massiah line of decisions is secret interrogation by investigatory
techniques that are the equivalent of direct police interrogation. Since "the Sixth
Amendment is not violated whenever - by luck or happenstance - the State obtains
incriminating statements from the accused after the right to counsel has attached," [citation
omitted], a defendant does not make out a violation of that right simply by showing that an
informant, either through prior arrangement or voluntarily, reported his incriminating
statements to the police. Rather, the defendant must demonstrate that the police and their
informant took some action, beyond merely listening, that was designed deliberately to
elicit incriminating remarks. (33)


While Kuhlmann did not address the question of what makes someone a government agent, the opinion's
remarks may reflect on how that question should be resolved. The opinion makes clear that no Sixth
Amendment violation occurs where the government agent is a "listening post" that takes no action to elicit
the statements. (34) In Kuhlmann, the government agent was the inmate informant, who simply listened to
what the defendant had to say. The "listening post" analysis could be taken a step further, however, to
apply to a law enforcement official who takes no action to encourage an inmate to become an informant
but merely listens to an inmate who has chosen on his own to obtain information from the defendant. 
Considering the last sentence in the above-quoted excerpt from Kuhlmann, it would not be true that "the
police and their informant took some action, beyond merely listening." The police would have taken no
action at all but to listen to the self-motivated informant's report. (35)

3. Texas cases


 This Court has not directly addressed the conditions required for a fellow inmate to become a
government agent for the purpose of the Sixth Amendment right to counsel, but three of our cases have
some bearing on the matter. In Macias v. State, an assistant district attorney arranged to place a capital
murder defendant in a jail cell with a particular inmate but did not inform the inmate of the reason for the
defendant's cell assignment. (36) The inmate later contacted the District Attorney's office regarding
incriminating statements made by the defendant. (37) At trial, the defendant claimed the incriminating
statements were inadmissible under Article 38.22 as the product of unlawful custodial interrogation. (38) We
disagreed, holding that the inmate was not "acting as an agent of law enforcement personnel" because he
was never told why appellant was placed in his cell and was never asked to question the defendant or to
report his discoveries to anyone. (39) Although we noted that the defendant had not raised a Sixth
Amendment right to counsel claim, (40) our analysis would seem equally applicable to such a claim. 

 In Wesbrook v. State, after the defendant's right to counsel had attached, the defendant and
another inmate engaged in conversations in which the defendant expressed a desire to kill his ex-wife and
her common-law husband. (41) Hoping to exploit this information to his benefit, the other inmate contacted
law enforcement through the local Crime Stoppers program. (42) After receiving this information, the
authorities entered into an agreement with the inmate: he would solicit more information from the defendant
and the authorities would put in a good word for the inmate in his pending prosecution. (43) Pursuant to
instructions, the inmate arranged telephone conferences between the defendant and an undercover
investigator posing as a "hit man." (44) These telephone conversations were recorded. (45) A majority of the
Court held that information obtained after the inmate struck a deal with the authorities had been obtained
in violation of the defendant's Sixth Amendment right to counsel. (46)

 However, Wesbrook's conviction was affirmed because two judges found no error (47) and three
judges determined that the error was harmless. (48) According to the plurality opinion, the error was
harmless, in part, because some of the inmate's testimony was admissible: all the information obtained by
the inmate before he entered into an agreement with the State was "free of any Sixth Amendment
concerns." (49) Although the dissent contended that the error was not harmless, it did not dispute the
plurality's characterization of which testimony was and was not admissible. (50)

 In Thompson v. State an inmate approached law enforcement about a defendant's attempts to
solicit the murder of a person who was a prospective witness in the defendant's upcoming capital- murder
trial. (51) The inmate informed a sheriff's deputy that the defendant was looking for someone to retrieve a gun
and give it to an accomplice who would carry out the murder. (52) The sheriff's deputy instructed the
inmate to direct the defendant toward Gary Johnson, an undercover investigator who would pose as
someone who could retrieve the gun. (53) The inmate followed these instructions and the defendant met with
Johnson. (54) The conversation between the defendant and Johnson was surreptitiously recorded. (55) 
Reversing and remanding for a new punishment hearing, the Court held that the tape recording was
erroneously admitted. (56) The Court remarked, however, that the information obtained by the inmate 
"before [the inmate] became an agent for the State was admissible." (57)

 As with the Supreme Court cases, Wesbrook and Thompson did not engage in a detailed
examination of the question of government agency - rather, agency was assumed at a certain point, either
because it was not in dispute, or because it was obvious from the facts. And neither of these cases are
binding precedent on the issue before us because the lead opinion in Wesbrook was a plurality and the
relevant statements in Thompson were dicta. Nevertheless, to the extent they are instructive, Wesbrook
and Thompson support the proposition that an inmate must at least act pursuant to an agreement with or
instructions from government officials before he will be deemed a government agent for Sixth Amendment
right to counsel purposes. 

4. Other jurisdictions


 While there are no definitive pronouncements from this Court or the United States Supreme Court
on the government agent issue in the Sixth Amendment right-to-counsel context, other jurisdictions have
squarely addressed the issue. All twelve of the regional federal circuit courts recognize that an informant
must be a government agent before the protections in Massiah are implicated and further recognize that
this agency inquiry is separate from whether the informant "deliberately elicited" information. (58) Similarly,
the "government agent" requirement has been recognized in a number of state jurisdictions. (59) 

 The First, Second, and Eighth Circuits espouse a bright-line test: "An informant becomes a
government agent for purposes of [Massiah] only when the informant has been instructed by the police to
get information about the particular defendant." (60) The Tenth and Eleventh Circuits and the State of
Delaware have indicated that there is no bright-line rule, (61) while the remaining jurisdictions have not taken
a position on whether a bright-line rule should apply but have applied a less rigid analysis than the three
"bright-line" federal circuits. (62) 

 Although there are some differences in the approaches of the various jurisdictions, they are unified
by at least one common principle: to qualify as a government agent, the informant must at least have some
sort of agreement with, or act under instructions from, a government official. (63) An inmate who elicits
information on his own initiative with the hope of striking a deal with the government is an entrepreneur, not
a state agent. (64) The Second Circuit has remarked: "The Sixth Amendment rights of a talkative inmate are
not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without
having been deputized by the government to question that defendant." Characterizing the defendant as an
"entrepreneur" in its case, the D.C. Circuit explained that the inmate "may have hoped to make a sale to
the Government when he spoke with [the defendant], but that does not make the Government responsible
for his actions, any more than a person who has bought an article from a salesman in the past is responsible
if the salesman then steals something similar in the hope of making a second sale." (65) The selfish motives
of as entrepreneurial inmate-informant who harbors an "unencouraged hope to curry favor" (66) are insufficient
to make him a government agent when the government does nothing to encourage his efforts. (67) As Justice
Souter stated, when he served on the New Hampshire Supreme Court: "Hopes and motives do not supply
the element of agreement or request that agency requires." (68) The Sixth Amendment simply "does not
protect a defendant against private individuals who wish to profit at his expense." (69) 

 It is true that there is profit to be made because informants have often been rewarded in the past. 
There will likely always be a market for incriminating information, but that does not make the government
responsible for the actions of those who choose to enter that market on their own initiative:Undoubtedly, most inmates who provide information to law enforcement officials harbor
the hope that their service will not go unrewarded. But as the court cautioned in
Lightbourne v. Dugger, "we must not confuse speculation about [an informant's] motives
for assisting the police for evidence that the police promised [the informant] consideration
for his help or, otherwise, bargained for his active assistance." One might argue that
merely by providing the market for information, the government violates the right to
counsel, but that would be to overstate the government's role in most cases; the instinct for
self-preservation is as sharply honed, if not more so, in prison as it is elsewhere. From the
moment that suspects are arrested, they learn (if it had not already occurred to them) that
cooperation with the authorities may benefit them. That inmates realize there is a market
for information about crime does not make each inmate who enters the market a
government agent. (70)

 

"[I]nmates, and other police informants, frequently volunteer information on their fellows in the hope, but
not the certainty, of obtaining favored treatment. That the informer has a self-interest in obtaining better
treatment from the government does not thereby automatically make the informer an agent of the
government. The motivation to inform comes from the informer and not the government." (71) And several
courts have expressly held that the analysis does not change even if the government is aware of the
entrepreneurial inmate's self-seeking tendencies and government officials believe - or even hope - that the
inmate will elicit information from the defendant. (72) Some courts have reasoned that all citizens, including
inmates, have a duty to report information about criminal activities, and while the Sixth Amendment may
limit the government's ability to encourage such reporting behavior, the government should not be required
to actively discourage such behavior either. (73)

 Complementing the principle that an entrepreneurial informant is not a government agent is the
principle that the government does not convert the informant into a government agent by merely accepting
the offered information. (74) Otherwise, the Fourth Circuit has opined:

any voluntary proffer of inmate informer assistance not met with silence or actually
repudiated by state officials would make inadmissible any inculpatory disclosures arguably
induced by the circumstances of confinement that are subsequently made by an accused
in conversations with the inmate. We do not believe that Henry implied this, nor that the
sixth amendment's protection of the right to effective assistance of counsel was intended
to reach so far. (75)


Some courts have relied upon Kuhlmann to hold that no Sixth Amendment violation occurs when the
government passively receives information from the entrepreneurial informant. (76) And many courts have
found that an inmate-informant's first of multiple communications about the defendant did not give rise to
an agency relationship. (77) 

 Various jurisdictions also agree that a person's past service as a government informant in unrelated
cases does not necessarily mean that the person is a government agent in the case at hand. (78) While past
service may be some evidence from which to infer agency, such evidence is simply something the factfinder
can consider in its discretion. (79) Even when there presently exists an ongoing relationship between the
informant and the government as to other cases, appellate courts have not mandated a conclusion that the
informant is a government agent in the case at hand unless the informant had a general agreement with the
government to ferret out information about crime wherever he finds it. (80) And not all courts agree that
agency is established by those facts. As discussed above, the First, Second, and Eighth Circuits hold that
an informant is not a government agent in a given case unless he has been instructed to obtain information
from that defendant; any general agreement to obtain information about crime is deemed irrelevant. (81) The
Supreme Court of Washington has also indicated that agency is established only when there is evidence
that the government "directed or steered the informant toward the defendant." (82)

 While there is general agreement that affirmative conduct by a government official is required to
convert an entrepreneurial informant into a government agent, courts have wrestled with what types of
conduct will suffice. One question is whether the Sixth Amendment is implicated by placement of an known
"entrepreneur" in the defendant's cell with the hope that incriminating information will be received as a result
but without informing the entrepreneur of this purpose. The Third Circuit has affirmatively indicated that
such conduct may pose a problem, (83) while other jurisdictions have done so by negative implication, pointing
out that there was no evidence of such intentional placement in the case at bar. (84) However, the Tenth
Circuit has indicated that the Sixth Amendment right to counsel was not implicated by the placement of an
inmate in the defendant's cell, even though before such placement, the inmate had talked to authorities
about incriminating admissions made by the defendant. (85) Similarly, the California Supreme Court found
no Sixth Amendment violation in a case in which "the deputy district attorney handling the defendant's case
intervened to prevent the sheriff's department from moving the defendant, hoping he would continue to
provide [the inmate-informant] with information." (86) And the bright-line approach by the First, Second, and
Eighth Circuits appears to preclude finding a constitutional violation under those circumstances because
there would be no instruction to the inmate to focus on the defendant. (87)

 What kinds of official statements or instructions confer agency status is also an issue in the cases. 
Noncommittal statements such as, "You can talk to us, but you do not have to," have been deemed
insufficient to confer agency status. (88) Several cases have held that a negatively-phrased "listening post"
instruction, such as, "Do not question the defendant," does not convert the inmate-informant into a
government agent. (89) Some courts have found even an additional admonition to the inmate to "keep your
ears open" or similar language to be insufficient to establish an agency relationship. (90)

 Finally, many courts have discussed whether the informant gained a benefit or reward for the
information. In finding that an agency relationship was absent, several courts have remarked that no reward
or benefit was given. (91) But in other cases, courts have declined to find an agency relationship even though
the informant did receive a reward or benefit as a result of the information obtained. (92) These cases are
consistent, however, if one views receipt of a benefit as evidence that may support a finding that there was
a prior agreement but does not require such a finding. Several courts have emphasized that the inquiry is
whether a benefit had already been promised at the time the informant elicited the information; if not, later
receipt of a benefit is of no consequence. (93)

5. Application


 We need not, at this point, try to define precisely when someone becomes a government agent for
Massiah purposes. Under the facts of this case, viewed in the light most favorable to the trial court's ruling,
Broome was not a government agent.

 Curry and Broome both testified that there was no agreement between Broome and the government
during the times Broome spoke with appellant. The evidence shows Broome attempted to strike a deal
but was unsuccessful. The government eventually rewarded him by dismissing his misdemeanor DWI
prosecution, but that decision was made after Curry's second interview with Broome - after Broome had
already obtained all the information that was later used at trial. Curry and Broome also testified that
Broome was never asked or instructed to elicit information from appellant. Although Broome's letter to
Curry (saying "the information you requested me to obtain I have") was some evidence to the contrary,
under Guzman the trial court was within its discretion to believe the testimony of the State's witnesses.

 We are left with evidence of two remarks attributable to the government that were not subject to
a factual dispute: (1) Broome's defense counsel's testimony of his understanding that the District Attorney's
office might give consideration if there was information that merited consideration, and (2) Curry's
testimony that he told Broome to consult his attorney if he wished to contact the District Attorney's office
in the future. Even if we assume that someone in the District Attorney's Office made a statement regarding
"information meriting consideration," and that it occurred before Broome elicited some or all of the
information from appellant - an assumption not clearly born out in the record - such a statement was simply
a noncommittal response. Broome was not told anything he did not already know: useful information is
sometimes rewarded. But no promise of reward was made here, and the District Attorney's office made
no attempt to encourage the further gathering of information. 

 As for Curry's admonition to Broome to consult his attorney if he wanted further contact with the
District Attorney's office, that statement appears to be an attempt by Curry to respect Broome's right to
counsel, rather than some sort of instruction or encouragement to obtain more information. Curry even
testified that that statement was routinely given at the end of interviews with inmates who had pending
prosecutions (as was the case with Broome), and the trial court was within its discretion to believe that
explanation. 

 Viewed with the proper deference to the trial court's ruling, the evidence in this case shows that
Broome was an entrepreneur who exploited appellant for his own gain. The government did nothing to
encourage Broome's behavior but merely accepted the information Broome had to offer. We conclude
that these circumstances are not enough to give rise to an agency relationship, and therefore, Broome was
not an agent of the government when he elicited appellant's incriminating statements. Point of error one
is overruled. 

III. EXTRANEOUS OFFENSES


 In point of error two, appellant contends that the State improperly impeached him with evidence
of extraneous, unadjudicated offenses. Appellant testified at the guilt phase of trial. During direct
examination, appellant admitted that he had been convicted of several robberies in New York. On cross-examination, he also admitted that he had been charged with more robberies than the ones he pled guilty
to. The testimony showed that in 1992 appellant was indicted for fifteen counts of robbery in the Bronx,
but he pled guilty to only two counts. Appellant admitted to robbing about ten people. Appellant's
complaint on appeal is that the State impeached him not only with his convictions but also with the other
offenses for which he was charged. Appellant contends that he attempted to prevent this allegedly
improper impeachment in a hearing outside the presence of the jury.

 Appellant had filed a motion in limine to require the State to approach the bench before going into
extraneous offenses. In accordance with the motion, the State approached the trial court for a hearing
outside the presence of the jury. In this hearing, the State revealed its intent to mention not only the
convictions but also the associated charged offenses that did not result in conviction. The following colloquy
occurred: 

[PROSECUTOR]: Additionally, Your Honor, the defendant, when he was talking about
that he robbed people on the trains and all the time he was talking plural, I believe we have
the right to go into those specific extraneous offenses.


[DEFENSE COUNSEL]: Well, that's what he was convicted of. We had to explain to
the jury.


[PROSECUTOR]: As he stated he was charged with a lot of robberies and he worked
out a plea bargain so that he didn't have to plead to all the ones he admitted doing, and so
I'm going to talk to him about that because he said it.


THE COURT: Yeah. Okay. Well, you might take it up outside the presence of the jury
and ask the question, and I could hear the question and the answer; but it sounds to me on
first - but it sounds to me like it's proper cross-examination. But I don't know. I haven't
heard the objection or the question yet.


[PROSECUTOR]: Judge, generally what I will ask him is how many people did he rob on
the subways with the fake gun or whatever. I will ask him about the number of counts that
were in the charges on him and what those actual charges were.


THE COURT: Okay.


[DEFENSE COUNSEL]: Like I said, he talked about them, Judge. He pled guilty to
them so - 


THE COURT: Okay. That's fine. All right sir. We will see you back in about 15 minutes.


Defense counsel lodged no objections during the prosecutor's subsequent cross-examination of the
defendant regarding the extraneous offenses.

 Although a motion in limine does not preserve error, error can be preserved by a timely objection
made in a hearing outside the presence of the jury. (94) However, we disagree with appellant's contention
that he attempted to prevent the admission of the complained-of evidence during the hearing outside the
presence of the jury. The record reveals that defense counsel raised no objection to the State's proposed
line of questioning during the hearing. And because appellant also raised no objection during the
subsequent cross-examination, he has failed to preserve error. (95) Point of error two is overruled.

IV. THE VIDEOTAPE


 In point of error three, appellant contends that the trial court erred in allowing the State to impeach
his testimony with an illegally obtained videotaped statement. He complains that the statement was illegally
obtained because it was the fruit of an arrest made without probable cause. He cites the Fourth
Amendment as authority for his argument. He also appears to argue that his statement should be
suppressed because it was involuntary and inherently unreliable. 

A. Factual background


 Bamberg gave the police a tip that appellant was involved in the murder and that he would be at
Williams's apartment. The police approached appellant, drew their weapons, ordered appellant to lie
down on the ground, handcuffed him, placed him in the back of a patrol car, and transported him to the
police station. Officer Ortiz testified that, at the time appellant was handcuffed, he was told that he was not
under arrest. At the police station, appellant was taken to an interview room. From that point forward,
appellant was videotaped.

 In the interview room, Ortiz took off appellant's handcuffs. He explained to appellant that the
police had detained him in the manner they did for their own safety and appellant's safety rather than to
effectuate an arrest. He further told appellant he was not under arrest and he was free to leave at any time. 
On cross-examination, Ortiz admitted that there were locked doors between appellant and the station's
exit. During his testimony, Ortiz never explained what safety concerns required detaining appellant in the
manner that occurred. Appellant testified that officers did indeed tell him in the interview room that their
method of transporting him to the station was due to security concerns, and they left appellant with the
impression that "all I had to do was say, you know, realistically did I know anything about the murder -
which I didn't - and to give them a statement and I was free to leave."

 Before asking any questions, the officers gave Miranda warnings. Appellant gave an exculpatory
version of events and denied any involvement in the crime. During the interview, appellant falsely told the
police that his name was Charles Manns. At trial, appellant testified that he did so because he knew he had
an outstanding parole warrant and would be arrested if the officers learned his true identity. Sometime
during the interview, after the warnings were given, appellant attempted to burn his fingertips with a
cigarette he was smoking. Sometime after this attempt, appellant was fingerprinted. Near the end of the
interview, officers did learn appellant's identity and as a result discovered the outstanding parole warrant. 
After that discovery, appellant was arrested.

 The State did not present evidence regarding any portion of this interview in its case-in-chief. 
During appellant's direct examination at trial, defense counsel questioned appellant about the interview and
about some of his responses. The State later cross-examined appellant regarding whether he had touched
his fingertips with a cigarette:

Q. You remember smoking cigarettes in there?


A. Yes.


Q. You remember what you did with those cigarettes other than smoke them?


A. I had cigarettes - I had cigarettes left that was in my pocket.


Q. Okay. Do you remember anything else you did with a burning cigarette?


A. Anything else I did with a burning cigarette?


Q. Uh-huh. Other than smoke it.


A. No.


Q. Remember touching it to your fingertips?


A. No.


Q. Didn't do that, did you?


A. No.


Q. Why would you do that anyway?


A. I didn't do that.


The defense raised no objection to this line of questioning. 

 After cross-examining appellant on a number of matters, the State requested a hearing outside the
presence of the jury. In that hearing, the State requested that the trial court admit into evidence the portion
of the videotaped interview that reflected appellant's attempt to burn his fingertips. Although defense
counsel conceded that he himself delved into the content of the interview in direct examination, he objected
to showing the portion of the videotape in question:

We had previously filed a motion contending that any such statements were illegally
obtained as a result of an illegal arrest. Now I know I went into some parts of the
statement. It was my intent at the time though concerning that the statement be admissible
and used afterwards for impeachment purposes. I did not specifically address with Mr.
Manns the issue of him touching his a [sic] cigarette to the tips of his fingers during that
statement. It's my understanding they intend to show that to the jury. We would object
to showing that to the jury at this point in time. Our position still is that any statements
obtained from Denard Manns on November 23, '98, the videotaped confessions, were
illegally obtained as a result of an arrest made without probable cause.


In both the motion to suppress and his oral objection, defense counsel cited Article I, §9 of the Texas
Constitution and Article 38.23 of the Texas Code of Criminal Procedure.

B. Procedural problems


 There are a number of procedural problems that impede addressing this issue on the merits. 
Initially, appellant seems to concede that impeachment is an exception to prohibitions against admitting
illegally obtained evidence but attempts to circumvent this exception by urging an involuntary confession
claim. However, such a claim was not urged at trial, and we will not consider it. (96) There is also a question
about whether any Fourth Amendment claim has been properly preserved. At trial, appellant cited to state
constitutional and statutory provisions but did not cite to the Fourth Amendment. In addition, appellant's
brief refers to a "statement" that was improperly admitted, but no statement was admitted - appellant's
attempt to burn his fingertips was nontestimonial conduct. Appellant does not discuss in his brief the nature
of the videotape evidence, though we discovered the nature of this evidence by reading the record at the
record citations he provided. However, assuming arguendo that we can reach the merits of a complaint
about the admission of the portion of the videotape involving appellant's attempt to burn his fingertips, his
argument fails.

C. Impeachment


 We need not decide whether the videotape evidence was legally obtained. The State did not
introduce the evidence in its case-in-chief but used it solely for impeachment purposes. According to the
Supreme Court, evidence obtained in violation of the Fourth Amendment (97) may be used to impeach the
defendant's trial testimony. (98) Moreover, the impeachment evidence need "not squarely contradict the
defendant's testimony on direct examination" so long as it contradicts his testimony on cross-examination
and the cross-examination "questions would have been suggested to a reasonably competent
cross-examiner." (99) Proper impeachment evidence includes physical evidence. (100) Impeachment is allowed
because "[i]t is essential...to the proper functioning of the adversary system that when a defendant takes
the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the
truth." (101) And impeachment evidence is allowed "even though its introduction is certain to result in
conviction in some cases." (102) However, the impeachment exception is narrowly crafted to guard against
perjury while giving the defendant the greatest possible leeway to testify on his own behalf: "But the
exception leaves defendants free to testify truthfully on their own behalf; they can offer probative and
exculpatory evidence to the jury without opening the door to impeachment by carefully avoiding any
statements that directly contradict the suppressed evidence." (103)

 Although appellant did not testify in his direct examination about his nonverbal conduct during the
videotaped interview, he did testify about statements he made during that interview. This testimony was
designed to convey the impression of forthrightness in his interview with the police and in his testimony at
trial. Appellant's conduct during the interview was relevant to rebut that impression. Even if it had not
been relevant, however, no objection was made to the State's line of questioning. Because appellant
denied committing the conduct, the State was permitted to offer the videotape evidence under the
impeachment exception to the exclusionary rule. Point of error three is overruled. 

V. SUFFICIENCY OF THE EVIDENCE - FUTURE DANGEROUSNESS


A. Legal sufficiency


 In point of error four, appellant contends that the evidence is legally insufficient to support the jury's
affirmative answer to the future dangerousness special issue. (104) Under a legal sufficiency review of this
special issue, we view the evidence in the light most favorable to the verdict and determine whether any
rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant
would commit criminal acts of violence constituting a continuing threat to society. (105) "We have enumerated
a non-exclusive list of factors" that may be considered in conducting such a review:

(1) the circumstances of the capital offense, including the defendant's state of mind and
whether he was acting alone or with other parties;


(2) the calculated nature of the defendant's acts;


(3) the forethought and deliberateness exhibited by the crime's execution;


(4) the existence of a prior criminal record and the severity of the prior crimes;


(5) the defendant's age and personal circumstances at the time of the offense;


(6) whether the defendant was acting under duress or the domination of another at the time
of the commission of the offense;


(7) psychiatric evidence; and


(8) character evidence. (106)


 In the light most favorable to the verdict, the evidence shows the following: The crime was a brutal
robbery-rape-murder of someone who had at one time been a neighbor. Appellant had previously been
convicted of disorderly conduct, attempted criminal mischief, criminal mischief, petty larceny, possession
of a controlled substance (twice), unauthorized use of a motor vehicle, attempted robbery (two counts),
and robbery (two separate occasions: the first time with one count, the second time with two counts). 
Appellant had robbed at least ten people with what appeared to be a gun. (107) In one of the robberies, after
appellant had taken the victim's money, he attempted to take a gold necklace the victim was wearing. The
victim hit appellant in the chin and ran, but appellant followed and engaged in a scuffle. After seeing two
police officers who noticed the scuffle, appellant escaped - with the victim's necklace.

 Appellant had been incarcerated twice in a penitentiary in New York. During the first period of
incarceration, a two year period, appellant incurred seventeen disciplinary infractions. One of those
infractions involved his possession of a plexiglass shard from a broken mirror. During the second period
of incarceration, appellant was disciplined fifteen times. 

 While awaiting trial for the current offense in the Bell County jail, appellant was disciplined for
possessing a homemade tattoo needle. In another incident, a Bell County jailer caught appellant fighting
with another inmate. In yet another incident, appellant swung his fist at a Bell County jailer who began a
routine search for contraband before allowing access to the prison law library. When the jailer blocked
appellant's swing, appellant said, "Touch me again, m----r f----r, and I'm going to kill you." Despite
appellant's warning, the jailer proceeded with the search. Appellant then stated, "I told you, you touch me,
I'm going to kill you." At that point, other officers came to take appellant back to his cell. While being
returned to his cell, appellant made threats to the jailer and the other officers. Appellant was also
disciplined in the Bell County jail for possessing a razor-sharp metal object that he had hidden in his
mattress.

 Under this record, we find that the evidence was legally sufficient to show a probability that
appellant would commit criminal acts of violence constituting a continuing threat to society. Point of four
is overruled.

B. Factual sufficiency


 In point of error five, appellant contends that the evidence was factually insufficient to support the
jury's answer to the future dangerousness special issue. We do not conduct a factual sufficiency review
of this special issue. (108) Point of error five is overruled. 

 The judgment of the trial court is affirmed.

 KELLER, Presiding Judge


DATE DELIVERED: December 17, 2003

PUBLISH
1. TEX. PEN. CODE §19.03(a). 
2. See TEX. CODE CRIM. PROC., Art. 37.071 §§2(b), (e), and (g). Unless otherwise
indicated, all future references to articles refer to the Texas Code of Criminal Procedure.
3. Art. 37.071 §2(h)
4. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).
5. Id. at 12.
6. In a letter dated February 3, 2000, Broome stated that, in exchange for his cooperation on
the drug cases, he wanted the State to release him on the street, pay his attorney, pay him $500,
reinstate his driver's license, give him clothes, and give him a say about whom he would testify against.
None of these conditions were met.
7. 955 S.W.2d 85 (Tex. Crim. App. 1997).
8. Id. at 89.
9. Id.
10. 377 U.S. 201, 202-203 (1964).
11. Id.
12. Id. at 206.
13. 447 U.S. 264, 266-267 (1980).
14. Id. at 271.
15. Id. at 266.
16. Id.
17. Id. at 270-271.
18. Id. at 266.
19. Id. at 270.
20. Id. 
21. Id. at 271 n. 10.
22. Id. at 267 n. 3, 274 n. 13.
23. 477 U.S. 159, 163-166 (1985).
24. Id. at 163.
25. Id. at 177.
26. Id. at 174-177.
27. 477 U.S. 436 (1986).
28. Id. at 439. 
29. Id.
30. Id.
31. Id. at 440.
32. Id. at 459-460.
33. Id. at 459.
34. See id. at 456 n. 19.
35. Although perhaps a matter of semantics, one could also dispute whether the self-motivated
informant is "their" informant.
36. 733 S.W.2d 192, 194 (Tex. Crim. App. 1987), cert. denied, 484 U.S. 1079 (1988).
37. Id.
38. Id. 
39. Id. at 195.
40. Id. at 194 n. 2
41. 29 S.W.3d 103, 116 (Tex. Crim. App. 2000)(plurality op.), cert. denied, 532 U.S. 944
(2001).
42. Id.
43. Id.
44. Id. at 116.
45. Id. at 117 n. 12.
46. Id. at 119 (plurality opinion by Mansfield J., joined by Meyers and Keasler, JJ.); Id. at 128
(Womack, J. dissenting, joined by Price, Holland, and Johnson, JJ.).
47. Id. at 123-127 (Keller, J. concurring, joined by McCormick, P.J)(no error because
information deliberately elicited involved extraneous offenses). 
48. Id. at 119-120 (plurality opinion).
49. Id. at 120.
50. Id. at 128 (Womack, J. dissenting). The dissent contended that the inadmissible testimony
was weightier because some of it had been electronically recorded. Id.
51. 93 S.W.3d 16, 22 (Tex. Crim. App. 2001), cert. denied, ___ U.S. ___, 72 U.S.L.W.
3246 (2003).
52. Id.
53. Id.
54. Id.
55. Id.
56. Id. at 28-29.
57. Id. at 28.
58. United States v. LaBare, 191 F.3d 60, 63-66 (1st Cir. 1999); United States v. Birbal,
113 F.3d 342, 345-346 (2nd Cir.), cert. denied sub. nom., Wright v. United States, 522 U.S. 903
(1997); United States v. Van Scoy, 654 F.2d 257, 259-261 (3rd Cir.), cert. denied, 454 U.S. 1126
(1981); Thomas v. Cox, 708 F.2d 132, 133-137 (4th Cir.), cert. denied, 464 U.S. 918 (1983);
Creel v. Johnson, 162 F.3d 385, 392-394 (5th Cir. 1998), cert. denied, 526 U.S. 1148 (1999);
United States v. Harris, 9 F.3d 493, 500 n. 2 (6th Cir. 1993)(dicta); United States v. York, 933
F.2d 1343, 1355-1358 (7th Cir.), cert. denied, 502 U.S. 916 (1991), overruled on other grounds,
Wilson v. Williams, 182 F.3d 562 (7th Cir. 1999); United States v. Johnson, 338 F.3d 918, 919-923 (8th Cir.), rehearing granted on other grounds, 338 F.3d 918 (2003); Brooks v. Kincheloe,
848 F.2d 940, 942-945 (9th Cir. 1988); United States v. Taylor, 800 F.2d 1012, 1014-1016 (10th
Cir. 1986), cert. denied, 484 U.S. 838 (1987); Lightbourne v. Dugger, 829 F.2d 1012, 1019-1021
(11th Cir. 1987), cert. denied, 488 U.S. 934 (1988); United States v. Watson, 894 F.2d 1345,
1347-1348 (D.C. Cir. 1990).
59. State v. Schad, 633 P.2d 366, 374-375 (Ariz 1981), cert. denied 455 U.S. 983 (1982);
People v. Fairbank, 947 P.2d 1321, 1334-1335 (Cal. 1997), cert. denied, 525 U.S. 861 (1998);
State v. Gordon, 504 A.2d 1020, 1024-1025 (Conn. 1985); Jackson v. State, 684 A.2d 745, 750-752 (Del. 1996), cert. denied, 520 U.S. 1171 (1997); Lightbourne v. State, 438 So.2d 380, 386
(Fla. 1983), cert. denied, 465 U.S. 1051 (1984); State v. Krause, 644 P.2d 964, 966-968 (Haw.
1982); State v. Fields, 908 P.2d 1211, 1217 (Ida.), cert. denied, 516 U.S. 922 (1995); Fredrick v.
State, 755 N.E.2d 1078, 1081-1082 (Ind. 2001); State v. Nelson, 325 N.W.2d 118, 119-120
(Iowa 1982); Commonwealth v. Harmon, 573 N.E.2d 490, 492-493 (Mass. 1991); State v.
Hawkins, 511 N.W.2d 9, 12 (Minn. 1994); Brown v. State, 682 So.2d 340, 352 (Miss. 1996), cert.
denied, 520 U.S. 1127 (1997); Thompson v. State, 771 P.2d 592, 593-596 (Nev. 1989); State v.
Bruneau, 552 A.2d 585, 586-591 (N.H. 1988)(Souter, J. authoring the court's unanimous opinion);
State v. Long, 575 A.2d 435, 458-459 (N.J. 1990); State v. Desnoyers, 55 P.3d 968, 974 (N.M.
2002); People v. Cardona, 360 N.E.2d 1306, 1306-1307 (NY 1977); Taylor v. State, 420 S.E.2d
414, 418-421 (N.C. 1992); State v. Olson, 274 N.W.2d 190, 194-195 (N.D. 1978); Castro v.
State, 844 P.2d 159, 169-170 (Okla. Crim. App. 1992), cert. denied, 510 U.S. 844 (1993); State v.
Smith, 791 P.2d 836, 843-845 (Ore. 1990); Commonwealth v. Lopez, 739 A.2d 485, 500-501
(Pa. 1999), cert. denied, 530 U.S. 1206 (2000); State v. Quattlebaum, 527 S.E.2d 105, 110-111
(S.C. 2000); State v. Bush, 942 S.W.2d 489, 511-513 (Tenn.), cert. denied, 522 U.S. 953 (1997);
Frye v. State, 345 S.E.2d 267, 281-282 (Va. 1986); In re Personal Restraint of Benn, 952 P.2d
116, 138-139 (Wash. 1998).
60. Johnson, 338 F.3d at 921 (quoting Moore v. United States, 178 F.3d 994, 999 (8th Cir.
1999), in turn quoting Birbal, 113 F.3d at 346)(bracketed material in Johnson); see also LaBare, 191
F.3d at 65-66.
61. Taylor, 800 F.2d at 1015; Lightbourne, 829 F.2d at 1020; Jackson, 684 A.2d at 751. 
The Tenth and Eleventh Circuits did not so much eschew a bright-line standard as they pointed out that
a bright-line standard had not been developed at the time. Taylor and Lightbourne, same pages. The
bright-line standard first articulated by the Second Circuit in Birbal postdates these cases.
62. See citations in footnotes 58 and 59.
63. See citations in footnotes 58 and 59. 
64. Birbal, 113 F.3d at 346; Watson, 894 F.2d at 1348. See also Brown, 682 So.2d at 352
(citing Watson).
65. Watson, 894 F.2d at 1348.
66. Thomas, 708 F.2d at 136; Harmon, 573 N.E.2d at 492; Quattlebaum, 527 S.E.2d at 110
(quoting Thomas).
67. Schad, 633 P.2d 375; People v. Memro, 905 P.2d 1305, 1324-1325 (Cal. 1995);
Gordon, 504 A.2d at 1024; Krause, 644 P.2d at 968; Thompson, 771 P.2d at 595; Long, 575 A.2d
at 458; Olson, 274 N.W.2d at 194-195.
68. Bruneau, 552 A.2d at 589.
69. Jackson, 684 A.2d at 752.
70. York, 933 F.2d at 1357 (citation omitted, bracketed material in York).
71. Cardona, 360 N.E.2d at 1306.
72. Johnson, 338 F.3d at 921 (In declining to find the informant to be a government agent, the
court remarked: "Mr. McNeese had been helpful to the government in the past. He had proved himself
an expert interrogator and informant. We may assume that the government, when Mr. McNeese was
placed in the same institution with Ms. Johnson, hoped that Mr. McNeese might come up with
something helpful...."); Lightbourne, 829 F.2d at 1021 ("Chavers's motives alone cannot make him an
agent of the police even if the police knew and understood that his motives probably were self-serving
and related to getting police cooperation in his own case"); Fairbank, 947 P.2d at 1334 (inmate-informant was not a government agent even though police detective believed inmate would continue to
try to obtain information from the defendant and deputy district attorney hoped defendant would
continue to provide inmate with information); Nelson, 325 N.W.2d at 119 (inmate was not a
government agent after telling sheriff of defendant's incriminating statements even though sheriff knew
further conversations between the inmate and the defendant were likely).
73. York, 933 F.2d 1343, 1357; Lightbourne, 829 F.2d at 1020; see also United States v.
Malik, 680 F.2d 1162, 1165 (7th Cir. 1982)("The Maliks suggest that Government must go to
extraordinary lengths to protect defendants from their own loose talk; they suggest that potential
informants be segregated from other inmates. We do not believe that the Sixth Amendment right to
counsel requires the Government to take such steps").
74. Van Scoy, 654 F.2d at 260; Thomas, 708 F.2d at 137; York, 933 F.2d at 1357;
Cardona, 360 N.E.2d at 1307. 
75. Thomas, 708 F.2d at 137.
76. United States v. Hicks, 798 F.2d 446, 449 (11th Cir. 1986), cert. denied, 479 U.S. 1035
(1987); Hawkins, 511 N.W.2d at 12; Taylor, 420 S.E.2d at 420.
77. Thomas, 708 F.2d at 133; Johnson, 338 F.3d at 919-920, 921; Fairbank, 947 P.2d at
1334; Jackson, 684 A.2d at 752; Nelson, 325 N.W.2d at 119; Harmon, 573 N.E.2d at 492-493;
Brown, 682 So.2d at 352; Taylor, 420 S.E.2d at 418-420.
78. Birbal, 113 F.3d at 346 ("informant as to an unrelated case"); Van Scoy, 654 F.2d at 259-261 (previously gave information on two unrelated murders); Johnson, 338 F.3d at 919, 922; Hicks,
798 F.2d at 448-449 ("inmate with a history of trading information he gathered in prison for favorable
treatment"); Watson, 894 F.2d at 1348 ("had been a DEA informant for two years"); Memro, 905
P.2d at 1324 ("history of testifying for the government"); Brown, 682 So.2d at 351-352 ("had
previously given the Natchez Police Department information on other criminal matters"); Thompson,
771 P.2d at 593-596 ("was no stranger to law enforcement and had acted as an informant and agent
for the police in the past"; previously testified in California murder case; had a history as agent and
informant for the DEA); Bruneau, 552 A.2d at 589 ("had acted as an informer in the past");
Desnoyers, 55 P.3d at 974 ("had been a confidential informant for the narcotics division of the
Albuquerque Police Department at an earlier time"); Cardona, 360 N.E.2d at 1307 ("provided
information on other defendants on several occasions"); Benn, 952 P.2d at 138 ("long history as a
police informant"); see also United States v. Brink, 39 F.3d 419, 423 (3rd Cir. 1994)("An inmate
who voluntarily furnishes information without instruction from the government is not a government agent,
even if the informant had been an agent in the past"). 
79. Van Scoy, 654 F.2d at 260-261; Cardona, 360 N.E.2d at 1307; Benn, 952 P.2d at 911-912.
80. York, 933 F.2d at 1356-1357; Hicks, 798 F.2d at 449; United States v. Sampol, 636
F.2d 621, 638 (D.C. Cir. 1980).
81. LaBare, 191 F.3d at 65-66 ("Where a jail mate simply agrees to report whatever he learns
about crimes from other inmates in general, we think there is not enough to trigger Massiah"); Birbal,
113 F3d at 345-346 (before encountering the defendant, inmate had agreed to provide the government
"any and all information in his possession relating directly or indirectly to any and all criminal activities or
other matters of which he has knowledge"); Johnson, 338 F.3d at 922 (rejecting the idea that agency
can be established "by proof of an implicit agreement arising from a longstanding informant's 'roving
agency' or 'symbiotic relationship' with the government"; stating that it meant what it said in a previous
case: "Moore does not say that an informant who has been instructed to get information about a
particular defendant is a government agent, but that one may be a government agent in other
circumstances as well").
82. Benn, 952 P.2d at 139 (quoting York).
83. Brink, 39 F.3d at 424.
84. Hicks, 798 F.2d at 449; Hawkins, 511 N.W.2d at 12; Desnoyers, 55 P.3d at 974;
Taylor, 420 S.E.2d at 420.
85. Taylor, 800 F.2d at 1015-1016.
86. Fairbank, 947 P.2d at 1334.
87. See LaBare, Birbal, and Johnson, supra.
88. Thomas, 708 F.2d at 133 ("if you want to give us information that's fine, if not, that's fine");
Smith, 791 P.2d at 844 (inmate told if he heard something and wanted to pass it along, he could, but
was not required to do so). 
89. Thomas, 708 F.2d at 133, 136 (inmate instructed not to ask any questions); State v.
Bainbridge, 787 P.2d 231, 241 (Ida. 1990)(detectives specifically instructed inmate not to question
the defendant); Taylor, 420 S.E.2d at 380 (inmate told not to discuss the crimes with the defendant);
Smith, 791 P.2d at 844 (inmate instructed not to question the defendant).
90. Thomas, 708 F.2d at 133, 136 (inmate told to let police investigator know if he heard
anything else and "to be alert to anything" the inmate "might say"); Lightbourne, 438 So.2d at 386
(inmate told to keep his ears open); Harmon, 573 N.E.2d at 493 (same); Brown, 682 So.2d at 352
(inmate told to let police know if she found anything out and to give them any letters defendant might
write to her).
91. Watson, 894 F.2d at 1348; Hawkins, 511 N.W.2d at 12; Thompson, 771 P.2d at 595;
420 S.E.2d at 420.
92. Fairbank, 947 P.2d at 1334 (received lower sentence); Lightbourne, 428 So.2d at 386
(received monetary reward); Cardona, 360 N.E.2d at 1307 ("cooperation was brought to the
attention of the Judge who sentenced the witness, thereby producing a measure of leniency that
apparently would not have been otherwise forthcoming"); Long, 575 A.2d at 458 (prosecutor agreed
to inform court of inmate's cooperation).
93. Thomas, 708 F.2d at 135 n. 4; Lightbourne, 829 F.2d at 1020; Krause, 644 P.2d at 968;
Long, 575 A.2d at 458.
94. Martinez v. State, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003).
95. Tex. R. Evid. 103(a)(1).
96. See Tex. R. App. P. 33.1(a).
97. Although appellant relied upon the Texas Constitution and Article 38.23 at trial, his brief
does not cite those provisions or explain how their protections might differ from the Fourth
Amendment. Consequently, we will analyze the claim solely under Fourth Amendment jurisprudence.
98. Walder v. United States, 347 U.S. 62, 65 (1953); United States v. Havens, 446 U.S.
620, 624-628 (1980).
99. Havens, 446 U.S. at 621, 626.
100. Id. at 623 (T-shirt).
101. Id. at 626-627.
102. Stone v. Powell, 428 U.S. 465, 485 (1976).
103. James v. Illinois, 493 U.S. 307, 314 (1990).
104. That special issue asks: "whether there is a probability that the defendant would commit
criminal acts of violence that would constitute a continuing threat to society." Article 37.071, §3(b)(2).
105. Smith v. State, 74 S.W.3d 868, 870 (Tex. Crim. App. 2002).
106. Id.
107. There was testimony that a fake gun was confiscated from appellant upon his arrest.
108. McGinn v. State, 961 S.W.2d 161, 166-169 (Tex. Crim. App.), cert. denied, 525 U.S.
967 (1998).