Death Opinion













IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-74,348




 


JOHN DAVID BATTAGLIA, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. F01-52159-UH 


CRIMINAL DISTRICT COURT 


DALLAS COUNTY





 Cochran, J., delivered the opinion of the unanimous Court.


O P I N I O N



 Appellant was convicted in April 2002 of capital murder for the shooting deaths of
his two young daughters. (1) Pursuant to the jury's answers to the special issues at the
punishment stage, (2) the trial judge sentenced appellant to death. (3) Direct appeal to this Court
is automatic. (4) Appellant raises twenty-one points of error, including a challenge to the
sufficiency of the evidence at punishment. We affirm.

I.


Factual Background


 Mary Jean Pearl was married to appellant for nine years, from 1991 to 2000. They
had two daughters, Mary Faith, who was born in January 1992, and Liberty, who was born
in January 1995. Throughout their marriage, appellant was verbally abusive toward Ms. 

Pearl, and she filed for divorce when she became afraid that appellant would be physically
violent. On Christmas morning 1999, before the divorce was final but during the couple's
separation, appellant went to Ms. Pearl's house to pick up the girls for church. Appellant
became angry at Ms. Pearl and attacked and beat her in front of the children. As a result of
that incident, appellant was charged with assault and placed on probation.

 Appellant's and Ms. Pearl's divorce was final in August 2000. An Agreed Protective
Order was issued at that time which prohibited appellant from committing family violence
against Ms. Pearl or their daughters, and from stalking, threatening, or harassing them. The
order also prohibited appellant from possessing a firearm.

 Around Easter 2001, Ms. Pearl received a phone message from appellant in which he
angrily swore at her and called her names. She reported the call to appellant's probation
officer, and a warrant was issued for his arrest. Appellant learned that his case was being
considered for a probation revocation and on Wednesday, May 2, 2001, he found out that a
warrant had been issued for his arrest. He was assured by a police officer that the warrant
would not be executed in front of his children and that he could make arrangements with his
lawyer to peacefully turn himself in.

 Appellant had plans to have dinner with his daughters that evening. While making
plans on the phone about where to eat, appellant told the girls that he was not very hungry
because he might be arrested that night and would not see them again for a year or more. Ms.
Pearl dropped the girls off with appellant at the agreed meeting place and then went to a
friend's house. When she arrived, she received a message that the girls had called and
wanted to ask her something. Ms. Pearl dialed appellant's phone number. Appellant
answered the phone, which was on the speaker-phone function, and ordered Mary Faith to
"ask her." Mary Faith said, "Mommy, why do you want Daddy to go to jail?" Ms. Pearl
began to tell appellant not to do this to the girls, and then she heard Mary Faith say, "No,
daddy, please don't, don't do it." Ms. Pearl yelled into the phone, "Run, run for the door." 
She heard gunshots, and appellant scream, "Merry fucking Christmas." After hearing more
gunshots, Ms. Pearl hung up and called 911.

 The police discovered the girls' bodies in appellant's apartment. Nine-year-old Mary
Faith had three gunshot wounds, including a shot to her back which severed her spinal cord
and ruptured her aorta, a contact shot to the back of her head which exited her forehead, and
a shot to her shoulder. Either of the first two shots would have been rapidly fatal.

 Six-year-old Liberty had four gunshot wounds and a graze wound to the top of her
head. One shot entered her back, severed her spinal cord, went through a lung, and lodged
in her chest. After losing about one third of her blood, she received a contact shot to her
head which passed through her brain, exited her face, and was immediately fatal.

 The girls were shot with a semiautomatic pistol which was found near the kitchen
phone. Mary Faith's body was found by the phone in the kitchen. Liberty's body was found
ten to fifteen feet from the front door.

 After shooting his daughters, appellant went with a girlfriend to a bar and then to a
tattoo parlor where he got tattoos related to his daughters. Appellant was arrested next to his
truck outside the tattoo parlor. It took four officers to restrain and handcuff him. Officers
took a fully loaded revolver from appellant's truck after his arrest.

 Police recovered two rifles, three shotguns, and a pistol (in addition to the murder
weapon) from appellant's apartment. The morning after the offense, police retrieved an
answering machine from Ms. Pearl's house. There were two messages from Mary Faith
stating that they had a question and asking Ms. Pearl to call them back. There was also a
message from appellant, left after the murders, in which he told the girls goodnight, stated
that he hoped they were resting in a different place, that he loved them and that they were
very brave, and that he wished they had nothing to do with their mother, that she was "evil
and vicious and stupid." 

 During the punishment phase, the jury heard evidence about appellant's violent
relationship with his first wife. Michelle Gheddi was married to appellant for two years,
from 1985 to 1987, and they had a daughter, Kristy. Ms. Gheddi described several incidents
during her marriage when appellant became angry and struck or threatened her. Twice
appellant was physically violent toward Ms. Gheddi's son from a previous marriage. Once
when Ms. Gheddi was traveling with appellant in the car, he became angry at some other
motorists and tried to reach for a gun he had in the car. They separated after an incident in
which appellant struck Ms. Gheddi while she was holding Kristy, causing her to drop the
child. 

 Ms. Gheddi obtained a protective order against appellant. Nonetheless, appellant
came to her house, watched her through the windows, and pounded on her doors and
windows. He followed her in his car. He tapped her phone line. He constantly called her
house and office at all hours of the day and night. He called Ms. Gheddi's employers and
creditors and made false statements about her. He threatened to kill himself and her, and
once described to her in detail how he planned to cut her up and kill her with a knife. One
night Ms. Gheddi woke up sometime after midnight to find appellant standing over her bed
and holding her shoulders down. He wanted to have sex, but Ms. Gheddi refused. Ms.
Gheddi filed a police report about the incident. 

 A short time later, appellant called a partner at the law firm where Ms. Gheddi was
an attorney. Appellant told him that Ms. Gheddi was having an affair with another partner
in the firm and that she was carrying his child. Appellant threatened to go to the press with
the information unless the partner convinced Ms. Gheddi to drop the charges against him. 
As a result of these events, the law firm initiated security measures to deny appellant access
to their offices. 

 In January of 1987, appellant tried to force Ms. Gheddi's car onto the median of the
freeway. Appellant pulled up next to her and pointed his finger at her as if holding a gun. 
He then threw a rock through his open window at her car. Ms. Gheddi filed another police
report, and appellant was arrested. Appellant spent several days in jail. When he was
released, he stopped harassing Ms. Gheddi and apologized for his behavior. Things
improved for a few months, and appellant and Ms. Gheddi were able to work out a divorce
agreement. However, appellant eventually became volatile again and angrily hit Ms. Gheddi
while he was picking up their daughter. After having been hit by appellant on one occasion
and pushed down the front steps to her house on another, Ms. Gheddi again filed charges
against him. Appellant begged her to drop the charges, but she refused. Later that day,
appellant approached Ms. Gheddi outside of her son's school. Smiling as he came toward
her, appellant said, "If I'm going back to jail, I'm going to make it worth my while." He then
beat Ms. Gheddi until she lost consciousness, breaking her nose and dislocating her jaw. Ms.
Gheddi was hospitalized. After appellant threatened to do the same to Ms. Gheddi's son, she
moved to Louisiana.

 About noon on the day that Mary Faith and Liberty were killed, Ms. Gheddi got a
message on her answering machine from appellant in which he stated that maybe Ms. Pearl
should lose her kids. That evening, appellant called Ms. Gheddi's house again and left a
message for Kristy. He told her he was sending her college money in an envelope and that
she should invest it wisely. An hour after that call, Ms. Gheddi found out that appellant had
killed Mary Faith and Liberty. Ms. Gheddi stated that she had always been afraid that
appellant would hurt Kristy.

 The defense called a forensic psychiatrist, Dr. Judy Stonedale, who testified that
appellant had suffered from bipolar disorder since his mid-to-late twenties. Dr. Stonedale
also testified that some people with bipolar disorder have psychotic episodes and lose touch
with reality. She believed that appellant was experiencing a psychotic episode at the time he
killed his daughters. Dr. Stonedale stated that bipolar disorder is treatable with medication,
and that appellant has been much better since taking medication in jail. She concluded that
appellant would not be a future danger if given a life sentence because he would be
medicated and in a controlled environment. On cross-examination, Dr. Stonedale stated that
bipolar disorder is a chemical imbalance, not organic brain damage. She also agreed that,
at the time of the murders, appellant knew what he was doing. 

 Dr. Edward Brown Gripon, another forensic psychiatrist, was appointed by the court
to evaluate appellant on the issues of sanity and competency. Dr. Gripon also diagnosed
appellant with bipolar disorder. He concluded that appellant would present a low risk of
continued acts of criminal violence. On cross-examination by the State, Dr. Gripon agreed
that appellant knew what he was doing at the time he murdered his children and recognized
that it was wrong.

 Forensic psychiatrist Dr. Richard E. Coons testified for the State on rebuttal. Dr.
Coons concluded that appellant killed his children as an act of anger and retribution, to
punish Ms. Pearl. Although Dr. Coons agreed with the other psychiatrists who had testified
that appellant probably has bipolar disorder, he believed appellant has a milder form of it
than the other two had opined. Dr. Coons stated that appellant has Bipolar II disorder rather
than Bipolar I. Bipolar I is characterized by extremely manic behavior, while those with a
Bipolar II disorder have hypomanic, or below manic, episodes which do not interfere with
their functioning. Dr. Coons further testified that appellant's conscience would not keep him
from committing offenses in the future because "[h]is conscious [sic] didn't keep him from
committing the instant offense." He also had concerns about whether appellant would
remain on his medication in jail because appellant liked the manic states he experienced
without the medication. Dr. Coons stated that appellant exhibited a number of characteristics
of a person with antisocial personality disorder and that appellant rationalized and blamed
others for his actions.

 Appellant rebutted Dr. Coons' testimony by calling yet another forensic psychiatrist,
Dr. Jay Douglas Crowder. Dr. Crowder concluded that appellant had "immature personality
disorder," a substance-abuse disorder which was in remission due to his confinement, and
"bipolar mood disorder type I." According to Dr. Crowder, appellant's mental illness was
a contributing factor in his commission of the offense. Dr. Crowder stated that if appellant
had been under treatment and receiving medication for his illness at the time, he would not
have committed the offense. Dr. Crowder believed that appellant would not present a future
danger based on his age, his intelligence, the controlled environment in prison, the fact that
he was on mood-stabilizing medication in prison, and the fact that the type of victim that
appellant had tended to harm would not be found in prison. On cross-examination, Dr.
Crowder stated that, when appellant killed his children, he made a decision to do it and he
knew the wrongfulness of his actions.

II.


A. Challenges to the Sufficiency of the Evidence

 In point of error nine, appellant claims the evidence is legally insufficient to prove
beyond a reasonable doubt that he would probably commit criminal acts of violence that
would constitute a continuing threat to society. Appellant argues the evidence does not
support such a finding because he would not be eligible for parole until he is eighty-five
years old, and there is a very low likelihood that he would injure others in prison. Appellant
also claims that the State failed to show any connection between the manner in which the
crime was committed and the propensity for appellant to be a danger in the future. Appellant
relies heavily upon his experts' opinion testimony that he suffered from bipolar mood
disorder, immature personality disorder, and substance abuse disorder. According to these
witnesses, appellant's future conduct would not constitute a threat in prison because his prior
violent acts were crimes of passion and were usually committed while he was in a delusional
or psychotic state.

 In reviewing the legal sufficiency of the evidence on future dangerousness, we look
at the evidence in the light most favorable to the verdict to determine whether any rational
trier of fact could have believed beyond reasonable doubt that the appellant would probably
commit future criminal acts of violence that would constitute a continuing threat to society. (5) 
 The circumstances of the offense alone, if sufficiently cold-blooded or calculated, may
support an affirmative answer to the first special issue. (6) Other evidence, such as a prior
criminal record, prior bad acts and uncharged conduct, psychiatric evidence, and character
evidence, also may support the finding. (7)

 The evidence is legally sufficient to support the jury's affirmative finding on the first
special issue. The offense itself was particularly horrific, calculated, and cold-blooded. The
evidence supports a conclusion that appellant crippled each of his daughters with gunshot
wounds that severed their spines, and then held the gun against their heads and shot them
again. There is evidence that appellant planned the killings in advance as an act of revenge
toward Ms. Pearl, and that he manipulated the situation so that he could commit the murders
as Ms. Pearl listened helplessly on the phone. The jury's "future dangerousness" finding is
also supported by the evidence of appellant's assaultive, abusive, and threatening conduct
toward both of his ex-wives over the years, as well as the assaults and threats towards Ms.
Gheddi's seven-year-old son. The testimony at trial showed a pattern of increasingly violent
conduct toward those who angered or annoyed him. (8) Some of the expert testimony also
supports the affirmative finding. Dr. Coons testified that, in his opinion, appellant committed
the offense as an act of revenge; he lacked a conscience that helped him conform his conduct;
and there was no guarantee that appellant would continue to take his medication in prison. 
There is ample evidence to support the jury's affirmative finding on the future dangerousness
issue. Point of error nine is overruled. 

 In his tenth point of error, appellant contends the evidence is factually insufficient to
support the jury's finding that appellant would be a future danger. For the reasons set out in
McGinn v. State, (9) we do not conduct a factual sufficiency review of this special issue. (10) Point
of error ten is overruled.

B. Claims Relating to Jury Selection

 In points of error one through seven, appellant contends that his effective assistance
of counsel and due process rights were violated by the trial court's denial of his challenges
for cause against seven different venirepersons because each had formed an opinion as to
appellant's guilt that prevented them from being impartial. A venireperson who has formed
an opinion about guilt or punishment based upon exposure to pretrial publicity is not
challengeable for cause if he states that: he can put that opinion aside; it will not influence
his verdict; and he will base his verdict solely on the law and facts presented at trial. (11) The
sole question for determination is whether a juror can put aside prior knowledge and opinion
and render an impartial verdict. (12) 

 We have reviewed the voir dire of each of the seven complained-of venirepersons. 
While all seven stated that they had formed an opinion about appellant's guilt based upon the
pretrial publicity, all seven unequivocally stated that they could put those opinions aside and
base a verdict solely on the law and evidence presented at trial. Appellant also alleges, in
point of error five, that one particular venireperson, Steven Crimson, had formed an opinion
that appellant should receive the death penalty. Despite having formed that opinion based
upon publicity, Mr. Crimson stated that he could put that opinion aside, be open-minded, and
listen to all of the evidence before making a decision about the appropriate punishment. 

 Thus, all of the venirepersons at issue stated that they could put aside their prior
knowledge and opinion and render an impartial verdict. (13) The trial judge was in the best
position to gauge the demeanor and sincerity of these prospective jurors. For most of these
challenges, the trial judge made extensive findings, on the record, summarizing the
venireperson's answers and putting those answers in context. Based upon this record, we
conclude that the trial judge did not abuse his discretion in denying appellant's challenges
for cause. Appellant's constitutional rights were not violated by the trial court's rulings. (14) 
Points of error one through seven are overruled. 

 In point of error eight, appellant claims that the trial court violated his rights by
granting the State's challenge for cause which was made on the ground that venireperson
Eric Aemisegger had foreclosed the possibility of the State being able to prove future
dangerousness in a prison society. Although appellant alleges that the error violated his
rights under the Sixth and Fourteenth Amendments, in Jones v. State, (15) this Court held that
"the constitutional right to trial by an impartial jury is not violated by every error in the
selection of a jury." (16) Instead, it is "[o]nly in very limited circumstances, when a juror is
erroneously excused because of general opposition to the death penalty ("Witherspoon"
error)," that "the exclusion of a juror by an unintentional mistake amount[s] to a
constitutional violation." (17) Mr. Aemisegger was not excused because of his opposition to the
death penalty. Thus, any error here was nonconstitutional. (18) 

 Appellant does not allege that he was harmed, but rather urges this Court to overrule
Jones, which held that the "erroneous excusing of a veniremember will call for reversal only
if the record shows that the error deprived the defendant of a lawfully constituted jury." (19) 
We decline to overrule Jones. Even assuming that the trial court erred in granting the State's
challenge for cause to Mr. Aemisegger, appellant has made no showing that the error
deprived him of a lawfully constituted jury. (20) Point of error eight is overruled.

C. Evidentiary Claims

 In point of error eleven, appellant complains of the admission of extraneous-act
evidence at the guilt phase. Specifically, he points to the following evidence as improperly
admitted: (1) evidence of appellant's December 1999 assault on Ms. Pearl, for which he
received probation; (2) evidence that appellant was in possession of multiple firearms at the
time of the murders; (3) evidence that appellant violated Ms. Pearl's protective order; and
(4) evidence of other assaultive and abusive behavior toward Ms. Pearl during the course of
their marriage. Appellant argues that this evidence did not tend to show his motive to kill
his children and was not relevant. Even if it were relevant, appellant contends, its probative
value was substantially outweighed by its prejudicial effect.

 Evidence of other crimes, wrongs, or acts is generally inadmissible at the guilt phase,
but Rule of Evidence 404(b) allows such evidence if it has relevance apart from character
conformity. (21) For example, evidence of other crimes, wrongs, or acts may be admissible to
prove identity or intent, to establish motive, or to show opportunity or preparation. (22) The
admissibility of evidence, including extraneous-act evidence offered for a purpose other than
character conformity under Rule 404(b), is within the trial court's discretion. As long as the
trial court's ruling was within the zone of reasonable disagreement, the reviewing court
should affirm. (23) A trial court's decision to admit evidence, finding that its probative value
is not substantially outweighed by the danger of unfair prejudice, is also given deference. (24)

 The trial court admitted the extraneous-acts evidence to show motive. The State's
theory of the case was that appellant committed the murders as an act of vengeance against
Ms. Pearl, whose report to the police had led to a motion to revoke appellant's probation. 
Evidence of one's motive to commit a crime is always relevant under Rules 401 and 404(b). (25)
The motive evidence in this case was, in fact, not particularly probative of a disputed issue
because the overwhelming evidence supported appellant's guilt. For the same reason,
however, admission of evidence showing appellant's motive for committing the murders was
not prejudicial on the issue of guilt. The trial court's decision to allow the evidence was
clearly within the zone of reasonable disagreement. There was no abuse of discretion. Point
of error eleven is overruled.

 In point of error twelve, appellant claims that the trial court erred by admitting, at the
guilt stage, evidence obtained as a result of an illegal search and seizure, in violation of the
Fourth Amendment to the United States Constitution. In his thirteenth point of error,
appellant makes the same claim under Article I, section 9, of the Texas Constitution. 
Because appellant provides no separate argument or authority for his state constitutional
claim, we do not address it. (26) 

 The trial court held a pretrial hearing on appellant's motion to suppress. Dallas Police
Officer Dane Thornton testified that he was on duty and driving on Canton Street on the
evening of May 2, 2001, when a woman who was "quite frantic" approached him. The
woman, later identified as Ms. Pearl, told Officer Thornton that she had been on the phone
with her children who were at her ex-husband's apartment when she heard them holler, "No
daddy, no," and she then heard five gunshots. Ms. Pearl told Officer Thornton that they were
standing in front of her ex-husband's apartment building, and told him the apartment number. 
Officer Thornton testified that, from what Ms. Pearl told him, he believed a shooting "was
still happening or had just finished occurring." 

 As Officer Thornton got out of his car, two other officers, who had been dispatched
to the scene, pulled up. All three officers entered the building and went up to appellant's
apartment on the fourth floor. Officer Thornton took the elevator, and the other two officers
took the stairs. They knocked and announced themselves, but got no response. Officer
Thornton testified that he went back downstairs to see if Ms. Pearl had a key because the
doors were the "commercial wooden" type which would not kick in very easily. (27) Ms. Pearl
did not have a key, and there was no apartment manager or maintenance personnel readily
available to open the door. A resident of the complex who was in the foyer told Officer
Thornton that he had not heard any shots or seen anyone leave the building. Officer
Thornton testified that he was downstairs looking for a key for about a minute before he
returned to appellant's apartment. 

 The officers decided to kick the door in because they believed the shooting had just
occurred, and they were concerned that the girls might be injured. It took three tries to force
the door open. Once inside, the officers saw the younger girl lying face down. She appeared
to be injured or dead. They found the older girl on the kitchen floor. She, too, appeared to
be injured or dead. The officers then did a sweep of the rest of the apartment, including
closets, to see if appellant was still inside. The officers saw several guns in the closets. They
also saw a handgun on a night stand near the body of the younger girl and another handgun
on the kitchen counter near the body of the older child. After determining that the girls were
dead and appellant was not inside the apartment, an officer was posted at the door to secure
the scene.

 Dallas Police Officer Zane Murray testified that he and his partner were dispatched
to the scene based on a report that a mother believed her children had been shot. When
Officer Murray and his partner arrived, they spoke briefly with Officer Thornton, and then
the three officers went to the apartment. They did not speak with Ms. Pearl because their
immediate focus was on getting to the apartment where the girls might have been shot. 
According to Officer Murray, when they received no answer at the door, Officer Thornton
went back downstairs to verify that Ms. Pearl had heard gunshots on the phone. In the
meantime, Officer Murray radioed for a supervisor to come to the scene. Officer Thornton
returned and stated that Ms. Pearl had definitely heard gunshots and believed that the girls
might be dead. At that point, believing that the girls might be inside, possibly seriously
injured but alive, the officers kicked in the door. They saw the younger girl lying face down
on the floor with blood pouring from her head. She appeared dead. The officers began a
search of the apartment for appellant. After determining that he was not there, they secured
the apartment and waited for the physical evidence team and others to arrive. A search
warrant was obtained about four hours later, but not before the bodies were removed and
photographs were taken.

 The trial court found, in part, that the warrantless entry was authorized under the
emergency doctrine. The court stated that "obtaining a warrant was impractical because the
officers reasonably believed there was immediate needs [sic] to act in order to protect or
preserve the life or prevent serious bodily injury." Appellant's sole argument is that any
evidence seized from the scene before the warrant was obtained should have been suppressed
because the officers' initial entry was not justified under the "emergency doctrine."

 In reviewing a trial court's ruling on a motion to suppress, we give "almost total
deference to a trial court's determination of historical facts" and review de novo its
application of the law. (28) Under the emergency doctrine, an officer's warrantless entry into
a home does not violate the Fourth Amendment if the officer has a reasonable belief that he
must act immediately "to protect or preserve life or avoid serious injury." (29) In determining
whether such a warrantless entry is justified, we apply an objective standard of
reasonableness which looks at the officer's conduct and takes into account the fact and
circumstances known to the officer at the time of the entry. (30) Courts use an objective
standard of reasonableness to assess the officers' belief that such an emergency existed. (31) 

 Appellant contends that the officers did not have probable cause because they acted
solely on the report of a hysterical woman whom they did not know. Appellant also argues
that the officers did not really believe there was an "immediate need to act" or they would
not have gone looking for a key instead of making the forced entry immediately.

 The record shows that the officers were told by Ms. Pearl, who was extremely
distressed, that she heard gunshots while on the phone with her ex-husband and daughters
and she believed that the children had been shot. The officers knew that Ms. Pearl had
reported this to 911 and that she believed that it had just occurred. Based upon Ms. Pearl's
frantic demeanor, the fact that she stated she heard gunshots while on the phone with her
daughters and heard her daughters yell, "No, daddy, no," and that Ms. Pearl had reported the
incident to 911, the officers' belief that they needed to gain entry quickly in case the girls
were injured and needed medical attention was an objectively reasonable one. They were
concerned that the door would not easily be forced in. Officer Thornton decided to see if
there was a key, and also wanted to verify that Ms. Pearl had definitely heard shots while on
the phone. He was downstairs and back in a couple of minutes, and immediately upon his
return, the officers forced the door open. They had an objectively reasonable belief that there
was "an immediate need to act in order to protect or preserve" the lives of the two girls. (32) 
The evidence supports the trial court's ruling that the officers' entry was justified under the
emergency doctrine. Points of error twelve and thirteen are overruled.

D. Challenges to the Texas Death Penalty Scheme

 In his fourteenth point of error, appellant claims that imposition of the death penalty
on mentally ill defendants violates the Eighth Amendment of the United States Constitution. 
Appellant argues that mental illness impairs understanding and functioning in ways that
substantially reduce personal culpability, that a sentence of death is grossly disproportionate
to the personal culpability of defendants afflicted by mental illness, and that executing
mentally ill individuals serves no legitimate penal objective. He argues that persons with
mental illness, such as himself, do not have the same capacity as others to appreciate the
consequences of their actions and they do not possess the requisite level of culpability to
warrant death. Given their diminished level of personal culpability, he argues, execution
does not fulfill the goal of retribution.

 The execution of mentally retarded persons and insane persons violates the Eighth
Amendment. (33) An insane person "has no comprehension of why he has been singled out and
stripped of his fundamental right to life." (34) Thus, his execution would have no retributive
value. And the execution of an individual who has "no capacity to come to grips with his
own conscience or deity" offends humanity. (35) Mentally retarded persons have diminished
culpability because of their many and varied impairments, including "diminished capacities
to understand and process information, to communicate, to abstract from mistakes and learn
from experience, to engage in logical reasoning, to control impulses, and to understand the
reactions of others." (36) The same reasons that make a mentally retarded person less morally
culpable also make it less likely that they are able to conform their conduct based upon an
understanding of the associated penalty, thus failing to serve the penal policy of deterrence.

 Appellant does not contend that he was or is insane or mentally retarded. (37) Rather,
he points to expert testimony at trial stating that his mental illness, bipolar disorder, was a
contributing factor in the commission of the offense. He argues that his mental illness caused
his reasoning to be impaired, diminished his capacity to evaluate the consequences of his
actions, and rendered him unable to conform his behavior to society's norms. But there is
no Supreme Court authority or authority from this Court suggesting that mental illness which
is a "contributing factor" in the defendant's actions or that caused some impairment or some
diminished capacity is enough to render one immune from execution under the Eighth
Amendment. (38) Certainly the issues concerning appellant's mental illness were relevant to
the question of mitigation and were properly presented and argued at punishment. But this
Court has previously rejected an invitation to extend the federal constitutional proscription
against execution of the insane to the greater category of mentally ill defendants, (39) and we
decline to do so today. Point of error fourteen is overruled.

 In his fifteenth point of error, appellant claims that the Texas death-penalty scheme
violates due process because the mitigation issue fails to require the State to prove the
absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to
Apprendi v. New Jersey. (40) We have rejected identical claims. (41) Point of error fifteen is
overruled.

 In point of error sixteen, appellant claims that the Texas death-penalty scheme violates
the Eighth and Fourteenth Amendments to the United States Constitution by requiring at least
ten "no" votes for the jury to return a negative answer to the punishment issues. We have
rejected identical claims. (42) Point of error sixteen is overruled.

 In point of error seventeen, appellant contends that certain undefined and vague terms
within the special punishment issues render the scheme unconstitutional. Appellant
complains of the failure to define "probability," "criminal acts of violence," "continuing
threat to society," "society," "sufficient mitigating circumstance or circumstances,"
"circumstances of the offense," and "Defendant's character and background." Omission of
an instruction defining these terms does not render the issues unconstitutional. Such terms
can be understood by jurors without a special instruction. (43) Point of error seventeen is
overruled.

 In points of error eighteen and nineteen, appellant claims the Texas death-penalty
scheme violates the United States and Texas Constitutions because "of the impossibility of
simultaneously restricting the jury's discretion to impose the death penalty while also
allowing the jury unlimited discretion to consider all evidence mitigating against imposition
of the death penalty." We have repeatedly rejected identical claims. (44) Points of error
eighteen and nineteen are overruled.

 In points of error twenty and twenty-one appellant contends his rights under the
United States and Texas constitutions were violated by the cumulative effect of the
constitutional errors he alleges in his brief. Appellant has failed to show any constitutional
errors. Points of error twenty and twenty-one are overruled.

 The judgment of the trial court is affirmed.


Delivered: May 18, 2005


Do Not Publish
1. Tex. Pen. Code § 19.03(a).
2. Tex. Code Crim. Proc. art. 37.071, § 2(b) & (e).
3. Id. art. 37.071, § 2(g).
4. Id. art. 37.071, § 2(h).
5. Jackson v. Virginia, 443 U.S. 307, 318-19 (1979).
6. Hayes v. State, 85 S.W.3d 809, 814 (Tex. Crim. App. 2002). 
7. Id.
8. Appellant argues that his violence is triggered only by his relationships with women, but
evidence at trial showed that his physical violence had also been triggered by his brother and by a
stranger.
9. 961 S.W.2d 161, 169 (Tex. Crim. App. 1998).
10. Manns v. State, 122 S.W.3d 171, 194 (Tex. Crim. App. 2003); Allen v. State, 108 S.W.3d
281, 285 (Tex. Crim. App. 2003), cert. denied, 540 U.S. 1185 (2004).
11. Cockrum v. State, 758 S.W.2d 577, 587-89 (Tex. Crim. App. 1988).
12. Id. at 589.
13. Id.
14. See Murphy v. Florida, 421 U.S. 794, 799-800 (1975) (noting that qualified jurors need
not be totally ignorant of the facts and issued involved in the case; "'[t]o hold that the mere existence
of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to
rebut the presumption of a prospective juror's impartiality would be to establish an impossible
standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict
based on the evidence presented in court'") (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)).
15. 982 S.W.2d 386 (Tex. Crim. App. 1998).
16. Id. at 391.
17. Id.
18. Id.
19. Id. at 394.
20. Feldman v. State, 71 S.W.3d 738, 749 (Tex. Crim. App. 2002).
21. Moses v. State, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003).
22. Id.
23. Id.
24. Id.
25. See Crane v. State, 786 S.W.2d 338, 349-50 (Tex. Crim. App. 1990) (stating that "the
prosecution may always offer evidence to show motive for the commission of the offense because
it is relevant as a circumstance to prove the commission of the offense").
26. Tex. R. App. P. 38.1.
27. The apartment was described as a loft in the Adams Hat Factory.
28. Guzman v. State, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997).
29. See Laney v. State, 117 S.W.3d 854, 861-62 (Tex. Crim. App. 2003).
30. See id. Because appellant's sole argument is that the initial entry was not justified under
the emergency doctrine, we do not address whether the warrantless "search" of the apartment was
"strictly circumscribed by the exigencies which [justified] its initiation." See id. at 862. In his brief,
appellant states the following:

 The trial court ruled that there were exigent circumstances that brought "into play"
the emergency doctrine and that the officers had probable cause to search the
residence. She also found that obtaining a search warrant was impractical because
the officers reasonably believed there was an immediate need to act to protect or
preserve life or prevent serious bodily injury. As a result of that finding, the court
held that all evidence that was in plain view during the "emergency search"
"[i]ncluding, but not limited to the bodies, the blood evidence, the hair fibers, the
handguns, the shells, the projectiles, the guns viewed in the closet, and any other
evidence within the area of plain view during the emergency entry and sweep of the
apartment" [was admissible].
31. Id.
32. See Laney, 117 S.W.3d at 861.
33. Atkins v. Virginia, 536 U.S. 304 (2002); Ford v. Wainwright, 477 U.S. 399 (1986).
34. Ford, 477 U.S. at 409.
35. Id.
36. Atkins, 536 U.S. at 318. 
37. At the time of the murders, appellant was a financial officer for an oil company and had
a private CPA practice.
38. We also note that the expert testimony in appellant's case does not support the breadth of
his claims. The experts all agreed that appellant knew what he was doing at the time he committed
the acts. While one expert did testify that appellant was "not thinking about the consequences"
because his mania was in control at the time of the offense, she did not state that appellant's
condition precluded him from being aware of the consequences. The main thrust of the experts'
testimony was that appellant's bipolar condition affected his impulse control-his ability to conform
his behavior. A lack of impulse control, while recognized in Atkins as one of a number of factors
reducing the personal culpability of mentally retarded individuals, has never been recognized as
sufficient alone to render one immune from execution under the Eighth Amendment.
39. Colburn v. State, 966 S.W.2d 511 (Tex. Crim. App. 1998).
40. 530 U.S. 466 (2000).
41. Resendiz v. State, 112 S.W.3d 541, 550 (Tex. Crim. App. 2003), cert. denied, 124 S. Ct.
2098 (2004).
42. Resendiz, 112 S.W.3d at 548-49; Wright v. State, 28 S.W.3d 526, 537 (Tex. Crim. App.
2000); Williams v. State, 937 S.W.2d 479, 490 (1996). 
43. See Feldman, 71 S.W.3d at 757; Ladd v. State, 3 S.W.3d 547, 572-73 (Tex. Crim. App.
1999). 
44. Escamilla v. State, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004); Turner v. State, 87
S.W.3d 111, 118 (Tex. Crim. App. 2002).