# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00010-CR

**Jon T. Banks, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
NO. D-1-DC-11-904061, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury found appellant Jon T. Banks guilty of murder and assessed a sentence of twenty-three years in prison. Appellant contends that the trial court erred by admitting portions of his interactions with his friend Humberto Tambunga and the police. He also contends that the jury's verdict was not supported by legally sufficient evidence. We affirm the judgment.

## BACKGROUND

Appellant's girlfriend, Jessica Krause-Patterson, worked as a dancer at a strip club. On April 12, 2010, Elmore Allen went to that club and bragged of having a lot of money, having recently cashed an $1,800 paycheck. He stayed at the club for several hours and interacted with several dancers, including Krause-Patterson. Allen drank heavily and fell asleep intermittently at his table.

Around 11 p.m., appellant came to the club in a car driven by his brother, Ricky Epps. The brothers spent some time outside the club with Krause-Patterson, and she paid for appellant to enter the club for a while. Shortly before the club's 2 a.m. closing, appellant and Epps drove to a gas station. Before they returned, Krause-Patterson accepted a ride from Allen. She testified that, while Allen drove, he tried to put his hand down her pants and also grabbed her chest.

Krause-Patterson directed Allen to take her to the apartment complex where she and appellant had lived with Eric "Gecko" Franklin. She testified that she did not want Allen to know where she currently lived. At 2:04 a.m., Krause-Patterson texted Epps's phone,[1] "Are you at the light to Geck's or my club?" A return text stated, "The car in front of y'all." Video recordings from a store located between the strip club and Franklin's apartment complex show a white passenger car similar to Epps's car driving past, followed within a minute by a white pickup similar to Allen's truck. Krause-Patterson said she directed Allen to park near the back of the complex because it was nearer Franklin's apartment.

Krause-Patterson testified that when she got out of Allen's truck, he followed her. She said that he grabbed her by her pants, then her arm. She testified that appellant arrived and said, "hey," which caused Allen to let go, but that Allen then blocked their path and said, "I'm the man." Krause-Patterson testified that appellant punched Allen in the face, Allen fell, and she and appellant left.

Epps testified that appellant returned to the car about three or four minutes after they had parked at the front of the apartment complex, and that Krause-Patterson walked with

---

[1] There was testimony that appellant was without his phone and used other people's phones.

him, carrying a duffel bag. Along their drive home, she threw some trash away. Krause-Patterson testified that the duffel contained her clothing and that the trash was a paper bag into which she had vomited from the stress of her encounter with Allen. Epps testified that appellant told him that, if asked, Epps should not say anything about whether he and appellant had been to the apartment complex.

Franklin, appellant's and Krause-Patterson's former roommate, found Allen's body at around 7:00 the next morning lying on an area of landscaped groundcover with his head lying on the top of a stone retaining wall. The blood flow patterns on Allen's face indicated to investigators that he had been hit in the face while standing up, then lay on his back afterwards. The medical examiner testified that falling on the stone wall caused Allen's brain to swell, leading to vasoconstriction, stroke, and death. Allen's pockets were empty, as was his cell phone case, but other valuables like rings and his truck keys remained. DNA was recovered from Allen's clothing, but appellant, Krause-Patterson, Franklin, and Epps were excluded as contributors of that DNA.

## DISCUSSION

**Was the evidence sufficient to support the jury's verdict of guilty?**

We will begin with appellant's sufficiency challenge because that review will provide context for our analysis of his challenges to the admission of evidence. The jury found that appellant robbed or attempted to rob Allen and that, in the course of and in furtherance of that crime, he committed or attempted to commit an act clearly dangerous to human life that caused Allen's death—namely, hitting Allen in the head with his hand or an unknown object. *See* Tex. Penal Code § 19.02(b)(3). Appellant contends that the jury should not have found him guilty of murder because

3

a rational trier of fact could have inferred only that he punched Allen to defend Krause-Patterson from Allen's alleged assaultive behavior and did not intend to kill him. *See id.* §§ 9.02, .32-.33.

In reviewing the sufficiency of the evidence to support the conviction, we consider all of the evidence in the light most favorable to the verdict to decide whether any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Circumstantial evidence is as probative as direct evidence in establishing an actor's guilt, and an actor's guilt can be established with circumstantial evidence alone. *Temple*, 390 S.W.3d at 359. In circumstantial-evidence cases, every fact need not point directly and independently to the guilt of the appellant; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Id.* The jury is the sole judge of the credibility and weight to be attached to the testimony of witnesses. *Jackson*, 443 U.S. at 319. When the record supports conflicting inferences, we presume the jury resolved the conflicts in favor of the verdict and defer to that determination. *Temple*, 390 S.W.3d at 359-60 (citing *Jackson*, 443 U.S. at 326).

The burden is somewhat different regarding defensive issues. A defendant has the burden of producing some evidence to support a claim of a defense under Penal Code section 2.03. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Once the defendant produces that evidence, the State bears the burden of persuasion to disprove the raised defense. *Id.* The State need not produce evidence, but must prove its case beyond a reasonable doubt. *Id.* If the jury finds the defendant guilty, then it implicitly finds against the defensive theory. *Id.*

4

Appellant does not here dispute that his punch caused Allen to fall, hit his head, and die, but contends that the evidence is insufficient to show that he hit Allen in the course of robbing or attempting to rob him. He contends that he did not take anything from appellant and was instead defending Krause-Patterson. Krause-Patterson testified that Allen began groping her in his truck and, at the apartment complex, repeatedly tried to stop her from walking away from him. Krause-Patterson said that after appellant arrived, Allen blocked their way and either grabbed or pushed appellant. She denied that they touched Allen's body after appellant hit him, much less took his money, wallet, or telephone. Appellant highlights testimony that Allen carried his wallet in his back pocket, that Allen was found on his back without a wallet, that no DNA from appellant was found on Allen, and that Allen's body did not appear to have been moved after he fell. Appellant posits that Allen's wallet might have been removed by someone at the strip club when Allen fell asleep at his table, as witnesses testified that theft was common in that situation. There was also evidence about Allen's previous interactions with other women, including another dancer who testified that he touched dancers inappropriately and Allen's common-law wife who testified that he pushed her once, causing her to call the police before the incident escalated.

The State argues that other evidence shows appellant's plan to take Allen's money and to evade capture for it. While appellant was in the club, a text was sent from Krause-Patterson's phone to appellant's friend, Tambunga, who was originally supposed to give Krause-Patterson a ride home. The text to Tambunga read, "You still coming right? . . . In? This bread still here." Krause-Patterson admitted that her acceptance of a ride from a customer was unusual. The text she sent to Epps's phone while riding in Allen's truck, asking whether appellant was near the apartment or the

club, would support the jury in believing that appellant and Krause-Patterson had a plan to meet at the apartments. The jury could reasonably have found that her directing Allen to park in the back of the complex while Epps parked in the front—when she knew from the text that appellant had been in front of her—was consistent with an intent to isolate Allen. A police detective testified that the absence of other injuries and the absence of disturbed foliage on the grounds around Allen were inconsistent with the claimed attempted sexual assault. State's witnesses also testified that the absence of appellant's DNA from Allen's pockets does not preclude the possibility that he took Allen's wallet. The jury could have believed that appellant caused Allen to empty his own pockets or appellant could have emptied them but either did not leave DNA during that limited contact or any DNA deposited was washed away by the sprinkler system that ran after their encounter. Krause-Patterson sent a text the next day to a friend with a photo of $700 that she claimed to have made on what other dancers described as a slow night—one dancer said she made at most $200 that (or any other) night at the club, and another dancer said there were three customers and five dancers and that "all of us barely was even out on the floor because we weren't mak[ing] any money."[2]

The jury also heard other testimony about appellant taking actions that would support a view that he attempted to conceal his actions on the night of the incident. When questioned days after Allen's death, appellant initially denied that Krause-Patterson accepted a ride from anyone else. Krause-Patterson, however, told police that Allen drove her to a store, which she admitted on

---

[2] Krause-Patterson testified that she typically made between $100 and $1,000—and most commonly between $400 and $600—depending on the night. A police detective testified that dancers typically earned $50-$400 per night, but the club owner testified that he had seen a dancer make $20,000 one night. Krause-Patterson testified, however, that she sent the photo to illustrate to her friend why she would not be pursuing a low-wage retail job with her friend.

6

the stand was untrue. Two residents of a property called Music Ranch also testified. Scott Smedley testified that appellant said he needed to burn some clothes. Richard Madsen, Jr. testified that appellant burned a pair of blue jean shorts, a white t-shirt, and a pair of tennis shoes. These clothes matched the appearance of clothes appellant was wearing when videotaped entering the club on the night of Allen's death.

Smedley also testified that appellant said he feared that he had accidentally killed a man. Smedley testified that appellant said that the man and Krause-Patterson were arguing, that appellant punched the man intending to knock him out, and that the man fell and hit his head on a rock. Smedley said that appellant appeared sick and did not seem happy about the incident.

We conclude that the evidence in this record is sufficient to support the jury's determination that appellant hit Allen in the course of robbing him and thereby caused his death. We also conclude that the evidence in this record supports the jury's rejection of appellant's asserted justification that he acted in defense of Krause-Patterson.

**Did the admission of the videotape of a portion of appellant's interrogation by police violate appellant's right to remain silent?**

Appellant contends that none of his interrogation by police on June 1, 2010 should have been admitted into evidence because he invoked his right to remain silent early on in their interaction. Evidence obtained in violation of the federal or state constitutions should not be admitted against the accused in the trial of a criminal case. Tex. Code Crim. Proc. art. 38.23; *see also* U.S. Const. amend. V; Tex. Const. art. I, § 10. The State may not use a defendant's oral statement made during his custodial interrogation unless he knowingly, intelligently, and voluntarily

7

waived his right against self-incrimination. Tex. Code Crim. Proc. art. 38.22; *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966). As with evidence obtained after a defendant's unequivocal invocation of his right to counsel, evidence obtained after a defendant's unequivocal invocation of his right to remain silent is inadmissible. *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010). We review the improper admission of such evidence under the constitutional error standard. *See* Tex. R. App. P. 44.2(a); *Ramos v. State*, 245 S.W.3d 410, 419 (Tex. Crim. App. 2008).

The trial court excluded from evidence portions of the conversation after the point at which the court found appellant invoked his right to remain silent, but appellant contends that he invoked that right earlier in the conversation and that he made damaging statements in the interim that the jury should not have heard. Appellant asserts that the evidence supporting conviction was not overwhelming and that the jury's verdict was influenced by his admissions to police that he went to the apartment complex where Allen's body was found, that he left Epps in the car, that what happened "freaked [him] out," and that he "found out that somebody died." He contends that his "thuggish and defensive attitude" in the interview allowed the jury to infer that he was a "violent thug with something to hide."

We need not decide whether the admission of the videotape of a portion of appellant's conversation with police was erroneous because we find beyond a reasonable doubt that any error in its admission did not contribute to the conviction or punishment. *See* Tex. R. App. P. 44.2(a). Epps independently testified that he took appellant to the apartments and that appellant left him to go find Krause-Patterson. Smedley testified that appellant told him he punched a man to knock him out, and the man fell on a rock and died. Smedley also said that appellant looked kind of sick and

8

like he was not proud of the incident—evidence that could actually favor appellant. Madsen testified that appellant burned some clothes that resembled clothes the jury had seen appellant wearing on a video from the club the night that Allen died. The jury also heard police detectives' testimony about the evolution of appellant's version of events along with circumstantial evidence tying appellant to the scene such as cell phone records and video. This evidence collectively is equivalent to the "admissions" that appellant made to police even without considering the testimony appellant adduced from Krause-Patterson regarding appellant's involvement in the incident. Because evidence similar to that adduced in the disputed portion of his police interrogation came in through other sources, we conclude beyond a reasonable doubt that the admission of appellant's statements to police and his demeanor when making them did not contribute to his conviction and punishment.

**Did the court abuse its discretion by admitting the videotape of appellant's conversation with Tambunga?**

Appellant raises three issues regarding the admission of portions of a conversation he had with his friend, Tambunga, while they were in an interrogation room. Appellant contends that the admission of this evidence violated his right to remain silent, violated his right to confront witnesses against him, was not proper rebuttal, and was so confusing and misleading because it was rife with street slang that it was more prejudicial than probative.

<u>Right to remain silent</u>

Appellant's conversation with Tambunga occurred after appellant invoked his right to remain silent when talking with police. Appellant contends that Tambunga was a police agent during their conversation and, therefore, that the conversation was inadmissible as a violation of his

9

right to remain silent. The trial court did not find that Tambunga was an agent of the State while he was in the interrogation room with appellant.

A person does not have to be a police officer or even a governmental employee in order to be an agent of the State whose interactions with a defendant might be inadmissible if the defendant has invoked his right to remain silent. *Wilkerson v. State*, 173 S.W.3d 521, 529 (Tex. Crim. App. 2005). The law does not presume an agency relationship, and the person alleging such a relationship has the burden of proving it. *Id.* But if a defendant does prove that a particular person—whether probation officer, teacher or friend—is working for or on behalf of the police by interrogating a person in custody, that agent is bound by all constitutional and statutory confession rules, including *Miranda* and article 38.22. *Id.* When considering whether information was elicited by a person acting as a government agent for purposes of deciding whether the defendant's invoked right to counsel was violated by the elicitation of information, courts must determine whether the person acted pursuant to an agreement with or instructions from a known "government agent." *Manns v. State*, 122 S.W.3d 171, 182 (Tex. Crim. App. 2003). The person eliciting information will not be considered a government agent absent agreement or instruction predating the elicitation of information. *Id.* We will apply this approach in determining whether the elicitation of information violates a defendant's right to remain silent.

The court of criminal appeals set out several queries relevant in determining whether a person is acting as an agent of police:

> First, courts should look for information about the relationship between the police and the potential police agent. Did the police know the interviewer was going to speak with the defendant? Did the police arrange the meeting? Were the police

10

present during the interview? Did they provide the interviewer with the questions to ask? Did they give the interviewer implicit or explicit instructions to get certain information from the defendant? Was there a "calculated practice" between the police and the interviewer that was likely to evoke an incriminating response from defendant during the interview? And finally, does the record show that the police were using the agent's interview to accomplish what they could not lawfully accomplish themselves? In sum, was law enforcement attempting to use the interviewer as its anointed agent?

Second, courts should examine the record concerning the interviewer's actions and perceptions: What was the interviewer's primary reason for questioning the person? Were the questions aimed at gaining information and evidence for a criminal prosecution, or were they related to some other goal? How did the interviewer become involved in the case? Did the interviewer help "build a case" that led to the person's arrest, or was the interviewer pursuing some other goal or performing some other duty? At whose request did the interviewer question the arrestee? In sum, did the interviewer believe that he was acting as an agent of law enforcement?

Finally, courts should examine the record for evidence of the defendant's perceptions of the encounter. When the defendant was interviewed, did he believe that he was speaking with a law-enforcement agent, someone cloaked with the actual or apparent authority of the police? What gave him this impression? Alternatively, would a reasonable person in defendant's position believe that the interviewer was an agent of law enforcement?

At bottom, the inquiry is: Was this custodial interview conducted (explicitly or implicitly) on behalf of the police for the primary purpose of gathering evidence or statements to be used in a later criminal proceeding against the interviewee? Put another way, is the interviewer acting as an "instrumentality" or "conduit" for the police or prosecution? Most simply: is the interviewer "in cahoots" with the police?

*Id.* at 530-31 (footnotes omitted). Some of these queries relate more to institutional interrogators like child protective services caseworkers, but we will examine the record as a whole and determine whether the trial court abused its discretion in deciding that Tambunga was not acting as an agent of the State when in the room with appellant. *See id.* at 532.

11

Appellant argues that actions and admissions by the State and statements by Tambunga in the interrogation room illustrate that he acted as a government agent during his conversation with appellant. Austin Police Detective David Fugitt said that he left the recording equipment running in the interrogation room for reasons of officer safety, not to record the conversation. At trial, the prosecutor stated that "the detectives put him in as a ploy to see if they would talk, but they did not direct Humberto to go in and try to get a confession from the defendant." Police may have been monitoring the conversation live because an officer entered the room shortly after appellant turned the light off in order to turn it back on, and another later removed appellant's shackles shortly after appellant complained about being shackled. Tambunga stated during the conversation that "Them laws want me to come in here and ask you to see if you'd say something." He also asked if appellant wanted him to tell the police "he ain't got nothin' to tell ya right now." Finally, appellant notes that Tambunga received immunity even though he did not testify.

The State counters that, during his trial testimony, Detective Fugitt flatly denied asking Tambunga to elicit information or to report to him anything said during Tambunga's time with appellant. Fugitt said that he moved Tambunga out of an interrogation room needed by other officers and put him in with appellant to await transport to another facility. When asked if Tambunga offered or agreed to elicit any information from appellant on behalf of law enforcement, Fugitt replied, "it was never discussed." The State also argues that Tambunga's repeated speculations during his conversation with appellant regarding the existence of recording equipment in the interrogation room are inconsistent with an agreement with the State to obtain information from appellant.

The critical decision is whether to believe Fugitt's denial that Tambunga talked to appellant under any agreement or instruction from the State.[3] The trial court chose to believe Fugitt, and we do not find any basis in the record to reject that credibility determination. Accordingly, we find no abuse of discretion in the trial court's decision that, because Tambunga was not a governmental agent, their conversation was not part of custodial interrogation and was not subject to exclusion as a violation of appellant's right to remain silent.

Did admission of Tambunga's portion of the conversation violate appellant's right to confront witnesses?

Appellant contends that the trial court should have excluded Tambunga's portion of their conversation because appellant was unable to cross-examine him regarding these out-of-court statements. *See generally Crawford v. Washington*, 541 U.S. 36 (2004). To implicate the Confrontation Clause, an out-of-court statement must (1) have been made by a witness absent from trial and (2) be testimonial in nature. *Id.* at 50-52; *Woodall v. State*, 336 S.W.3d 634, 641 (Tex. Crim. App. 2011). The *Crawford* holding applies only when the extrajudicial testimonial statements of a witness who does not testify at trial are sought to be admitted. *See Crawford*, 541 U.S. at 59. When the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of prior testimonial statements. *Id*. n.9.

---

[3] Appellant asserts that the trial judge adopted another judge's previous decision that Humberto Tambunga was not acting as an agent of the State. Appellant argues that the trial judge had before her additional information that was not before the judge that made the original decision, such as the prosecutor's "admission" that detectives placed Tambunga in the room to see what appellant might say to him. We review the judge's decision to admit the evidence at trial based on the record as a whole—and more particularly, the record before the judge who admitted the evidence in this trial—not just the record before a previous judge on the case.

13

Tambunga was present at trial,[4] and appellant did not call him as a witness. *See* Tex. R. App. P. 33.1(a). Appellant contends that he could not do so because the videotape was introduced in the State's rebuttal through Fugitt's testimony. Appellant urges that, under the mandatory order of proceedings, he could not have called Tambunga for the first time on his rebuttal. *See* Tex. Code Crim. Proc. art. 36.01. But appellant did not even ask the trial court to exercise its discretion to permit him to call Tambunga.[5] The rulings of a court on decisions regarding the order of proof will not be disturbed absent a showing of an abuse of discretion. *Laws v. State*, 549 S.W.2d 738, 741 (Tex. Crim. App. 1977). The court shall allow testimony to be introduced at any time before the argument of a cause is concluded if it appears necessary to a due administration of justice. Tex. Code Crim. Proc. art. 36.02. Appellant had the opportunity to confront Tambunga in court under oath and chose not to do so, which may have waived his objection under the Confrontation Clause. *See Woodall*, 336 S.W.3d at 645-46 (defendant's decline of trial court's offer to issue writ of attachment to secure witness waived his Confrontation Clause-based objection to admission of the witness's grand jury testimony).

---

[4] The trial court and the attorneys—including counsel appointed for Tambunga—discussed that Tambunga was present, had immunity, and was willing to testify. Appellant's counsel stated that he chose not to call Tambunga because of that immunity.

[5] Appellant cites as illustrating the mandatory nature of the order of proceedings a case holding that, when the prosecutor failed to read the indictment before presenting evidence, the trial court could not simply allow the prosecutor to read the indictment and allow the witness who had previously testified to assert that he would testify exactly the same way again if asked. *See Castillo v. State*, 530 S.W.2d 952, 953 (Tex. Crim. App. 1976). The court held that, unless the defendant stipulated to the evidence previously introduced, the law required the State to reintroduce the evidence after the reading of the indictment. *Id*. at 954.

More critically, Tambunga's statements made during the conversation were not testimonial. A hearsay statement is "testimonial" when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). Appellant's *Crawford* complaint on appeal concerns Tambunga's statements during the conversation, and there is no indication that Tambunga was being interviewed or interrogated in order to establish or prove past events.[6] The trial court did not abuse its discretion by admitting this evidence over appellant's *Crawford*-based Confrontation Clause objection.

Was the conversation too confusing or substantially more unfairly prejudicial than probative because of the way the conversants spoke?

Appellant contends that the videotape of the conversation was substantially more prejudicial than probative because the conversants' use of slang and "thuggish 'gangsta' language" made it difficult to understand (and, therefore, not very probative) and unfairly suggested that the jury convict appellant because of his language and attitude rather than his actions. We will uphold the trial court's decision to admit evidence unless it is an abuse of discretion—i.e., whether it acted arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).

We find no abuse of discretion based on the style of the conversation. The trial court's statement that the language spoken was "barely English" and open to interpretation

---

[6] To the extent the issue on appeal could encompass appellant's statements made in this same conversation, it fails for the same reason—appellant was not being interrogated or interviewed.

15

does not establish that it found the conversation so unintelligible or offensive as to invite unfair prejudice. The trial court reasonably could have found that the jurors could understand the language sufficiently and could separate any reaction to the style of appellant's speech from the substance of his statements.

Was the videotape of the conversation proper rebuttal?

Appellant contends that the videotape of his conversation with Tambunga was not proper rebuttal because his comments to Tambunga did not conflict with his theory that he was defending Krause-Patterson. The prosecution is entitled to present on rebuttal any evidence that tends to refute the defensive theory of the accused and the evidence introduced in support of it. *Laws*, 549 S.W.2d at 741. Among the topics appellant and Tambunga discussed were the alleged attempts by police to get him to confess to a crime he did not commit, appellant's assertion that he was not sure whether the man who gave Krause-Patterson a ride was the man who died, the possibility of directing suspicion to Franklin, the question of who might have "snitched" on him, and how police otherwise might have discovered his connection to the crime scene. Not discussed were an attempted sexual assault by Allen or a defense of Krause-Patterson. While appellant did not in the conversation deny that he had intended only to protect Krause-Patterson, we conclude that the trial court did not abuse its discretion by concluding that the conversation as a whole tended to rebut his defensive theory. The jury could reasonably consider whether appellant's failure to mention the defensive motivation during this wide-ranging conversation with a friend cast some doubt on whether appellant had actually acted in Krause-Patterson's defense in striking Allen.

16

**CONCLUSION**

We affirm the judgment of conviction and the punishment.

_____

Jeff Rose, Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Affirmed

Filed: April 11, 2014

Do Not Publish

17